LAWYERS FOR CLEAN WATER, INC.
Caroline Koch (Bar No. 266068)
         Email: caroline@lawyersforcleanwater.com
1004-A O'Reilly Avenue
San Francisco, California 94129
Telephone: (415) 440-6520
Facsimile: (415) 440-4155

*Attorneys for Plaintiffs*
INLAND EMPIRE WATERKEEPER and ORANGE COUNTY COASTKEEPER

*Additional Plaintiffs' Counsel Listed On Next Page*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| INLAND EMPIRE WATERKEEPER, a program of ORANGE COUNTY COASTKEEPER; ORANGE COUNTY COASTKEEPER, a California non-profit corporation;<br><br>       Plaintiffs,<br><br>  vs.<br><br>ROBERTSON'S READY MIX, LTD., a California Limited Partnership,<br><br>      Defendant. | Civil Case No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br><br>**(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.*)** |

INLAND EMPIRE WATERKEEPER
Colin Kelly (Bar No. 266956)
Jacqueline Neumann (Bar No. 307090)
        Email:  colin@iewaterkeeper.org
6876 Indiana Avenue, Suite D
Riverside, California 92506
Telephone:  (951) 530-8823
Facsimile:  (951) 530-8824


ORANGE COUNTY COASTKEEPER
Colin Kelly (Bar No. 266956)
Jacqueline Neumann (Bar No. 307090)
        Email:  colin@coastkeeper.org
        Email:  jacqueline@coastkeeper.org
3151 Airway Avenue, Suite F-110
Costa Mesa, California 92626
Telephone:  (714) 850-1965
Facsimile:  (714) 850-1592

Inland Empire Waterkeeper and Orange County Coastkeeper (collectively "Waterkeeper" or "Plaintiffs"), by and through their counsel, hereby allege:

## I.      JURISDICTION AND VENUE

1.      This is a civil suit brought under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* ("Clean Water Act" or "CWA"). *See* 33 U.S.C. § 1365. This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United States).

2.      On February 18, 2016, Waterkeeper issued a sixty (60) day "Notice of Violation and Intent to File Suit" letter ("Notice Letter") to Robertson's Ready Mix, Ltd. ("Defendant") for its violations of California's General Permit for Discharges of Storm Water Associated with Industrial Activities (*National Pollution Discharge Elimination System ("NPDES") General Permit No. CAS000001, Water Quality Order No. 92-12-DWQ, Order No. 97-03-DWQ, as amended by Order No. 2015-0057-DWQ*) (hereinafter "Storm Water Permit") and the Clean Water Act. The Notice Letter informed Defendant of Waterkeeper's intent to file suit against it to enforce the Storm Water Permit and the Clean Water Act.

3.      The Notice Letter was also sent to the registered agent for Defendant, the Administrator of the United States Environmental Protection Agency ("EPA"), the Administrator of EPA Region IX, the Executive Director of the State Water Resources Control Board ("State Board"), and the Executive Officer of the Regional Water Quality Control Board, Santa Ana Region ("Regional Board"), as required by 40 C.F.R. § 135.2(a)(1). The Notice Letter is attached hereto as **Exhibit A** and is incorporated herein by reference.

4.      More than sixty (60) days have passed since the Notice Letter was served on Defendant and the State and Federal agencies. Waterkeeper is informed and believes, and thereon alleges, that neither the EPA nor the State of California has commenced or is

1 diligently prosecuting an action to redress the violations alleged in this complaint. *See* 33
2 U.S.C. § 1365(b)(1)(B). This action is not barred by any prior administrative penalty
3 under section 309(g) of the CWA. 33 U.S.C. § 1319(g).

4    5.    This complaint seeks relief for Defendant's substantive and procedural
5 violations of the Storm Water Permit and the Clean Water Act resulting from
6 Defendant's operations at 6120 20th Street, Riverside, California 92509 ("Facility").

7    6.    Venue is proper in the Central District of California pursuant to section
8 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the sources of the violations are
9 located within this judicial district.

10 **II.    LEGAL BACKGROUND**

11    **A.    The Clean Water Act.**

12    7.    The Clean Water Act requires point source discharges of pollutants to
13 navigable waters be regulated by an NPDES permit. 33 U.S.C. § 1311(a); *see* 40 C.F.R.
14 § 122.26(c)(1).

15    8.    Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the
16 discharge of any pollutant into waters of the United States unless the discharge complies
17 with various enumerated sections of the CWA. Among other things, section 301(a)
18 prohibits discharges not authorized by, or in violation of, the terms of a NPDES permit
19 issued pursuant to section 402 of the CWA, 33 U.S.C. §§ 1311(a) and 1342(b).

20    9.    "Waters of the United States" are defined as "navigable waters," and "all
21 waters which are currently used, were used in the past, or may be susceptible to use in
22 interstate or foreign commerce, including waters which are subject to the ebb and flow of
23 the tide." 33 U.S.C. § 1362(7); 40 C.F.R. § 122.2.

24    10.    The EPA promulgated regulations defining "waters of the United States."
25 *See* 40 C.F.R. § 122.2. The EPA interprets waters of the United States to include not only
26 traditionally navigable waters, but also other waters, including waters tributary to
27 navigable waters, wetlands adjacent to navigable waters, and intermittent streams that
28 could affect interstate commerce.

11.     The Clean Water Act confers jurisdiction over waters that are tributaries to traditionally navigable waters where the water at issue has a significant nexus to the navigable water. *See Rapanos v. United States*, 547 U.S. 715 (2006); *see also N. Cal. River Watch v. City of Healdsburg*, 496 F.3d 993 (9th Cir. 2007).

12.     A significant nexus is established if the "[receiving waters], either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters." *Rapanos*, 547 U.S. at 779; *N. Cal. River Watch*, 496 F.3d at 999-1000.

13.     A significant nexus is also established if waters that are tributary to navigable waters have flood control properties, including functions such as the reduction of flow, pollutant trapping, and nutrient recycling. *Rapanos*, 547 U.S. at 782; *N. Cal. River Watch*, 496 F.3d at 1000-1001.

14.     Section 505(a)(1) of the Clean Water Act provides for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." *See* 33 U.S.C. §§ 1365(a)(i) and 1365(f).

15.     Robertson's Ready Mix, Ltd. is a "person" within the meaning of section 502(5) of the Clean Water Act. *See* 33 U.S.C. § 1362(5).

16.     An action for injunctive relief is authorized under section 505(a) of the Clean Water Act. *See* 33 U.S.C. § 1365(a).

17.     Each separate violation of the Clean Water Act subjects the violator to a penalty of up to $37,500 per day. *See* 33 U.S.C. §§ 1319(d) and 1365(a); 40 C.F.R. § 19.4 (Adjustment of Civil Monetary Penalties for Inflation).

18.     Section 505(d) of the Clean Water Act allows prevailing or substantially prevailing parties to recover litigation costs, including attorneys' fees, experts' fees, and consultants' fees. *See* 33 U.S.C. § 1365(d).

**B.     California's Storm Water Permit.**

19.     Section 402(p) of the Clean Water Act establishes a framework for

regulating industrial storm water discharges under the NPDES permit program. 33 U.S.C. § 1342(p).

20.     Section 402(b) of the Clean Water Act allows each state to administer its own EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water. *See* 33 U.S.C. § 1342(b). States with approved NPDES permit programs are authorized by section 402(b) to regulate industrial storm water discharges through individual NPDES permits issued to dischargers and/or through the issuance of a statewide general NPDES permit applicable to all industrial storm water dischargers. *See id.*

21.     California is a state authorized by EPA to issue NPDES permits.

22.     In California, the State Board is charged with regulating pollutants to protect California's water resources. *See* Cal. Water Code § 13001.

23.     The Storm Water Permit is a statewide general NPDES permit issued by the State Board pursuant to the Clean Water Act.

24.     Between 1997 and June 30, 2015, the Storm Water Permit in effect was Order No. 97-03-DWQ, which Waterkeeper refers to as the "1997 Permit."

25.     On July 1, 2015, pursuant to Order No. 2014-0057-DWQ the Storm Water Permit was reissued, which Waterkeeper refers to as the "2015 Permit."

26.     The 2015 Permit superseded the 1997 Permit, except for enforcement purposes, and its terms are as stringent, or more stringent, than the terms of the 1997 Permit. *See* 2015 Permit, Findings, ¶ 6.

27.     In order to discharge storm water lawfully in California, industrial dischargers must secure coverage under the Storm Water Permit and comply with its terms, or obtain and comply with an individual NPDES permit. 1997 Permit, Finding #2; 2015 Permit Findings, ¶ 12. Prior to beginning industrial operations, dischargers are required to apply for coverage under the Storm Water Permit by submitting a Notice of Intent to Comply with the Terms of the General Permit to Discharge Storm Water Associated with Industrial Activity ("NOI") to the State Board. *See* 1997 Permit, Finding

#3; *see also* 2015 Permit, Findings, ¶ 17.

28.     Violations of the Storm Water Permit are violations of the Clean Water Act. *See* 1997 Permit, Section C(1) (Standard Provisions); *see also* 2015 Permit, Section XXI(A) (Duty to Comply).

### C.     The Storm Water Permit Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations.

29.     The Storm Water Permit contains certain absolute prohibitions. The Storm Water Permit prohibits the direct or indirect discharge of materials other than storm water ("non-storm water discharges"), which are not otherwise authorized by an NPDES permit, to the waters of the United States. *See* 1997 Permit, Discharge Prohibition A(1); *see also* 2015 Permit, Discharge Prohibition III(B).

30.     The Storm Water Permit Effluent Limitations require dischargers covered by the Storm Water Permit to reduce or prevent pollutants in storm water discharges through the implementation of Best Available Technology Economically Achievable ("BAT") for toxic or non-conventional pollutants, and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others. Conventional pollutants are listed at 40 C.F.R. § 401.16 and include biochemical oxygen demand ("BOD"), total suspended solids ("TSS"), oil and grease ("O&G"), pH, and fecal coliform. *See* 1997 Permit, Effluent Limitation B(3); *see also* 2015 Permit, Section V(A).

31.     EPA's NPDES Storm Water Multi-Sector General Permit for Industrial Activities ("MSGP") includes numeric benchmarks for pollutant concentrations in storm water discharges ("EPA Benchmarks").

32.     The EPA Benchmarks provide an objective standard to determine whether a facility's Best Management Practices ("BMPs") are successfully developed and/or implemented. *See* MSGP, 80 Fed. Reg. 34,403, 34,405 (June 16, 2015); MSGP, 73 Fed. Reg. 56,572, 56,574 (Sept. 29, 2008); MSGP, 65 Fed. Reg. 64,746, 64,766-67 (Oct. 30, 2000).

Complaint                                        7

33.     Discharges from an industrial facility containing pollutant concentrations that exceed EPA Benchmarks indicate that the facility has not developed and/or implemented BMPs that meet BAT for toxic pollutants and/or BCT for conventional pollutants. *Id*.

34.     The Storm Water Permit Receiving Water Limitations prohibit storm water discharges from adversely impacting human health or the environment. *See* 1997 Permit, Receiving Water Limitation C(1); *see also* 2015 Permit, Section VI(B).

35.     Storm water discharges with pollutant levels that exceed levels known to adversely impact aquatic species and the environment are violations of Receiving Water Limitation C(1) of the 1997 Permit and Section VI(B) of the 2015 Permit.

36.     The Storm Water Permit Receiving Water Limitations also prohibit storm water discharges that cause or contribute to an exceedance of any "applicable Water Quality Standard in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan." *See* 1997 Permit, Receiving Water Limitation C(2); *see also* 2015 Permit, Receiving Water Limitation VI(A).

37.     Water Quality Standards ("WQS") are pollutant concentration levels determined by the State Board, the various regional boards, and the EPA to be protective of the beneficial uses of the waters that receive polluted discharges.

38.     The Water Quality Control Plan for the Santa Ana River Basin (Basin Plan), California Regional Water Quality Control Board, Santa Ana Region, 3rd Ed., (Rev. June 2011) ("Basin Plan") identifies the "Beneficial Uses" of water bodies in the region. The existing and/or potential Beneficial Uses for downstream of the point at which it receives storm water discharges from the Facility (i.e., Santa Ana River Reaches 1-4) include: Agricultural Supply; Groundwater Recharge; Water Contact Recreation; Non-contact Water Recreation; Warm Freshwater Habitat; Wildlife Habitat; and Rare, Threatened or Endangered Species. *See* Basin Plan at Table 3-1.

39.     Surface waters that cannot support the Beneficial Uses of those waters listed in the Basin Plan are designated as impaired water bodies pursuant to section 303(d) of

the Clean Water Act. According to the 2010 303(d) List of Impaired Water Bodies, Reach 4 of the Santa Ana River is impaired for pathogens, Reach 3 is impaired for copper, lead, and pathogens, and Reach 2 is impaired for indicator bacteria.[1]

40.     Discharges of pollutants at levels above WQS contribute to the impairment of the Beneficial Uses of the waters receiving the discharges.

41.     WQS applicable to dischargers covered by the Storm Water Permit include, but are not limited to, those set out in the Basin Plan and in the Criteria for Priority Toxic Pollutants for the State of California ("CTR"), 40 C.F.R. § 131.38.

42.     The Basin Plan sets forth, among other things, narrative WQS for floating material, chemical oxygen demand ("COD"), oil and grease, sediment, settleable matter, and suspended materials, toxic substances, and sets forth numeric WQS for COD and pH. *See* Basin Plan, p. 4-6, 4-18, and Table 4-1.

43.     The Basin Plan provides that "[t]he pH of inland surface waters shall not be raised above 8.5 or depressed below 6.5 as a result of controllable water quality factors." *See* Basin Plan, 4-18.

44.     The Basin Plan provides that "[w]aste discharges shall not result in increases in COD levels in inland surface waters which exceed the values shown in Table 4-1 or which adversely affect beneficial uses." *See* Basin Plan, 4-9. Table 4-1 of the Basin Plan lists the WQS for COD for Reaches 3 and 4 of the Santa Ana River as 30 mg/L.

45.     The Basin Plan provides that "Inland surface waters shall not contain suspended or settleable solids in amounts which cause a nuisance or adversely affect beneficial uses as a result of controllable water quality factors." *See* Basin Plan, 4-19.

46.     The Basin Plan includes a toxicity standard which states that "[t]he concentrations of toxic pollutants in the water column, sediments or biota shall not adversely affect beneficial uses." *See* Basin Plan, 4-20.

---

[1] 2010 Integrated Report – All Assessed Waters, *available at* http://www.waterboards.ca.gov/water_issues/programs/tmdl/integrated2010.shtml (last accessed on April 4, 2016)

Complaint                                    9

47.     The CTR includes numeric criteria set to protect human health and the environment in the State of California. Water Quality Standards; Establishment of Numeric Criteria for Priority Toxic Pollutants for the State of California Factsheet, EPA-823-00-008 (April 2000), available at:

http://water.epa.gov/lawsregs/rulesregs/ctr/factsheet.cfm.

48.     Discharges with pollutant levels in excess of the CTR criteria, the Basin Plan standards, and/or other applicable WQS are violations of Receiving Water Limitation C(2) of the 1997 Permit and Section VI(A) of the 2015 Permit.

### D.     The Storm Water Permit Storm Water Pollution Prevention Plan Requirements.

49.     Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP") at the time industrial activities begin. 1997 Permit, Section A(1)(a) and E(2); 2015 Permit, Sections I(I) (Finding 54), X(B). The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of stormwater and authorized non-stormwater discharges from the facility. 1997 Permit, Section A(2); 2015 Permit, Section X(G). The SWPPP must identify and implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-stormwater discharges. 1997 Permit, Section A(2); 2015 Permit, Section X(H). The SWPPP must include BMPs that achieve pollutant discharge reductions attainable via BAT and BCT. 1997 Permit, Order Section A(2); 2015 Permit, Section I(D) (Finding 32), Section X(C).

50.     The SWPPP must include: a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutants control measures; a description of storm water management practices; a description of the BMPs to be implemented to reduce or prevent pollutants in storm water discharges and authorized non-storm water

discharges; the identification and elimination of non-storm water discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; and a description of individuals and their current responsibilities for developing and implementing the SWPPP. 1997 Permit, Section A(1)-(10); 2015 Permit, Section X.

51.     The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, to identify and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and to reduce or prevent the discharge of polluted storm water from industrial facilities. 1997 Permit, Section A(2); 2015 Permit, Section X.

52.     The Storm Water Permit requires the discharger to evaluate the SWPPP on an annual basis and revise it as necessary to ensure compliance with the Storm Water Permit. 1997 Permit, Section A(9); 2015 Permit, Section X(A)(9). The Storm Water Permit also requires that the discharger conduct an annual comprehensive site compliance evaluation that includes a review of all visual observation records, inspection reports and sampling and analysis results, a visual inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system, a review and evaluation of all BMPs to determine whether the BMPs are adequate, properly implemented and maintained, or whether additional BMPs are needed, and a visual inspection of equipment needed to implement the SWPPP. 1997 Permit, Sections A(9)(a)-(c); 2015 Permit, Section XV.

53.     Section A(9)(d) of the 1997 Permit requires that the discharger submit an evaluation report that includes an identification of personnel performing the evaluation, the date(s) of the evaluation(s), necessary SWPPP revisions, a schedule for implementing SWPPP revisions, any incidents of non-compliance and the corrective actions taken, and a certification that the discharger is in compliance with the Storm Water Permit. 1997 Permit, Section A(9)(d)(i)-(vi). If certification of compliance cannot be provided, the

discharger must explain in the evaluation report why the facility is not in compliance with the Storm Water Permit. *Id*., Section A(9)(d). The evaluation report shall be submitted as part of the Annual Report specified in Section B(14) of the Storm Water Permit. *Id*.

54.     The SWPPP and site maps must be assessed annually and revised as necessary to ensure accuracy and effectiveness. 1997 Permit, Sections A(1), B(3)-(4); 2015 Permit, Sections I(J) (Finding 55), X(B)(1).

**E.     The Storm Water Permit Monitoring and Reporting Requirements.**

55.     The 1997 Permit required facility operators to develop and implement a monitoring and reporting program ("M&RP") when industrial activities begin at a facility. 1997 Permit, Sections B(1)-(2) and E(3). The 2015 Permit requires implementation of an M&RP. 2015 Permit, Sections X(I) and XI. The M&RP must ensure that storm water discharges are in compliance with the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations specified in the 1997 Permit. *See* 1997 Permit, Section B(2); *see also* 2015 Permit, Section X(I). The M&RP must ensure that practices at the facility to prevent or reduce pollutants in storm water and authorized non-storm water discharges are evaluated and revised to meet changing conditions at the facility, including revision of the SWPPP. *Id*.

56.     The objectives of the M&RP are to ensure that BMPs have been adequately developed and implemented, revised if necessary, and to ensure that storm water and non-storm water discharges are in compliance with the Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. 1997 Permit, Sections B(2)(a) and B(2)(b); 2015 Permit, Sections X(I) and XI.

57.     The 2015 Permit requires facility operators to monitor and sample storm water discharges to ensure that the facility is complying with the terms of the Storm Water Permit. 2015 Permit, Sections I(J) (Findings 55-56) and XI.

58.     Section B(2)(d) of the 1997 Permit and Section XI(A)(4) of the 2015 Permit require that the M&RP shall be revised as necessary to ensure compliance with the Storm Water Permit.

59.     Section B(4)(a) of the 1997 Permit and Section XI(A) of the 2015 Permit require dischargers to conduct monthly visual observations of storm water discharges.

60.     Section B(4)(c) of the 1997 Permit and Section XI(A)(2) of the 2015 Permit require dischargers to document the presence of any floating and suspended materials, oil and grease, discolorations, turbidity, or odor in the discharge, and the source of any pollutants in storm water discharges from the facility. Dischargers are required to maintain records of observations, observation dates, discharge locations observed, and responses taken to reduce or prevent pollutants from contacting storm water discharges. *See* 1997 Permit, Section B(4)(c); 2015 Permit, Section XI(A)(3).

61.     The Storm Water Permit also requires dischargers to revise the SWPPP as necessary to ensure that BMPs are effectively reducing and/or eliminating pollutants at the facility. 1997 Permit, Section B(4)(c); 2015 Permit, Section X(B)(1).

62.     The Storm Water Permit requires dischargers to visually observe and collect samples of storm water discharges from all locations where storm water is discharged. 1997 Permit, Sections B(5) and B(7); 2015 Permit Section XI(B)(4).

63.     Section B(5)(a) of the 1997 Permit required dischargers to collect storm water samples during the first hour of discharge from the first storm event of the Wet Season and at least one other storm event in the Wet Season. All storm water discharge locations must be sampled. Facility operators that do not collect samples from the first storm event of the Wet Season are still required to collect samples from two other storm events of the Wet Season and must explain in the Annual Report why the first storm event was not sampled.

64.     Section B(15) of the 1997 Permit required dischargers participating in a group monitoring plan to collect at least two (2) samples from each discharge point at the Facility over a five (5) year period. *See* 1997 Permit, Sections B(5), B(7), and B(15).

65.     Section XI(B)(3) of the 2015 Permit requires dischargers participating in a compliance group to collect and analyze storm water samples from one (1) QSE within the first half of each reporting year (July 1 to December 31) and one (1) QSE within the

Complaint                                    13

second half of each reporting year (January 1 to June 30).

66.     The Facility was and/or is a member of the Building Materials Industry Group Monitoring Program, and thus the Facility Owner and/or Operator must comply with the group monitoring provisions set forth in Section B(15) of the 1997 Permit and Section XI(B)(3) of the 2015 Permit.

67.     Section B(5)(b) required that sampling conducted pursuant to the 1997 Permit occur during scheduled facility operating hours that are preceded by at least three (3) working days without storm water discharge.

68.     Section XI(B)(1) of the 2015 Permit requires sampling if a precipitation event produces a discharge for at least one drainage area, and it is preceded by forty-eight (48) hours with no discharge from any drainage area ("QSE").

69.     Section XI(B)(2) of the 2015 Permit requires dischargers to collect and analyze storm water samples from two (2) QSEs within the first half of each reporting year (July 1 to December 31), and two (2) QSEs within the second half of each reporting year (January 1 to June 30).

70.     Section XI(B)(11) of the 2015 Permit, among other requirements, provides that permittees must submit all sampling and analytical results for all samples via SMARTS within thirty (30) days of obtaining all results for each sampling event.

71.     Section B(5)(c)(i) of the 1997 Permit required dischargers to analyze each sample for pH, specific conductance ("SC"), TSS, and total organic carbon ("TOC"). A discharger may substitute analysis for O&G instead of TOC.

72.     Section B(5)(c)(ii) of the 1997 Permit required dischargers to analyze each sample for toxic chemicals and other pollutants likely to be present in significant quantities in the storm water discharged from the facility.

73.     Section B(5)(c)(iii) and Table D of the 1997 Permit and Table 1 of the 2015 Permit require facilities classified as Standard Industrial Classification ("SIC") code 3273 (Ready-Mix Concrete), such as the Facility, to also analyze storm water samples for iron, as well as other parameters required by the Regional Board.

74.     Section XI(B)(6)(a)-(b) of the 2015 Permit requires dischargers to analyze samples for TSS, O&G, and pH.

75.     Section XI(B)(6)(c) of the 2015 Permit requires dischargers to analyze samples for pollutants associated with industrial operations.

76.     Section XI(B)(6) of the 2015 Permit also requires dischargers to analyze storm water samples for additional applicable industrial parameters related to receiving waters with 303(d) listed impairments, or approved Total Maximum Daily Loads.

77.     Section B(14) of the 1997 Permit required that dischargers submit an Annual Report to the applicable Regional Board by July 1 of each year. The Annual Report must include a summary of visual observations and sampling results, an evaluation of the visual observations and sampling and analysis results, laboratory reports, the annual comprehensive site compliance evaluation report specified in Section A(9), an explanation of why a facility did not implement any activities required, and the records specified in Section B(13)(i).

78.     Section XVI of the 2015 requires dischargers to submit an annual report with a Compliance Checklist that indicates whether a discharger complies with, and has addressed all applicable requirements of the 2015 Permit, an explanation for any non-compliance of requirements within the reporting year, as indicated in the Compliance Checklist, an identification, including page numbers and/or sections, of all revisions made to the SWPPP within the reporting year, and the date(s) of the Annual Evaluation.

## III.     PARTIES

### A.     Inland Empire Waterkeeper and Orange County Coastkeeper.

79.     Orange County Coastkeeper is a non-profit public benefit corporation organized under the laws of the State of California. Orange County Coastkeeper's office is located at 3151 Airway Avenue, Suite F-110, Costa Mesa, California 92626.

80.     Inland Empire Waterkeeper is a program of Orange County Coastkeeper. Inland Empire Waterkeeper's office is located at 6876 Indiana Avenue, Suite D, Riverside, California 92506.

81.     Together, Inland Empire Waterkeeper and Orange County Coastkeeper have over 2,000 members who live and/or recreate in and around the Santa Ana River watershed. Waterkeeper is dedicated to the preservation, protection, and defense of the environment, wildlife, and natural resources of local surface waters. To further these goals, Waterkeeper actively seeks federal and state agency implementation of the Clean Water Act and, where necessary, directly initiates enforcement actions on behalf of itself, its members, and others.

82.     Waterkeeper's members use and enjoy the Santa Ana River and its tributaries for fishing, boating, swimming, bird watching, picnicking, viewing wildlife, sailing, kayaking, hiking, and engaging in scientific study, including monitoring activities.

83.     Discharges of polluted storm water from the Facility degrade water quality and harm aquatic life in the Santa Ana River and its tributaries, and impair Waterkeeper's members' use and enjoyment of those waters.

84.     The violations of the Storm Water Permit and Clean Water Act at the Facility are ongoing and continuous. Thus, the interests of Waterkeeper's members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the Storm Water Permit and the Clean Water Act.

**B.      The Facility Owner and/or Operator.**

85.     Waterkeeper is informed and believes, and thereon alleges, that Robertson's Ready Mix, Ltd. is an owner of the Facility.

86.     Waterkeeper is informed and believes, and thereon alleges, that Robertson's Ready Mix, Ltd. has owned the Facility since at least March 2004.

87.     Waterkeeper is informed and believes, and thereon alleges, that Robertson's Ready Mix, Ltd. is an operator of the Facility.

88.     Waterkeeper is informed and believes, and thereon alleges, that Robertson's Ready Mix, Ltd. has operated the Facility since at least March 2004.

89.     Waterkeeper refers to Robertson's Ready Mix, Ltd. herein as the "Facility

1  Owner and/or Operator."

2  90.  Waterkeeper is informed and believes, and thereon alleges, that Robertson's

3  Ready Mix, Ltd. is an active limited partnership registered in California.

4  91.  Waterkeeper is informed and believes, and thereon alleges, that the name

5  and address of the Registered Agent for Robertson's Ready Mix, Ltd. is Mervyn

6  Encarnacion, 200 S. Main Street, Suite 200, Corona, California 92882.

7  **IV.    FACTUAL BACKGROUND**

8  **A.    Facility Site Description.**

9  92.  Waterkeeper is informed and believes, and thereon alleges, that the Facility

10  is an active concrete batch plant.

11  93.  Waterkeeper is informed and believes, and thereon alleges, that raw

12  materials, including aggregate (rock, sand, and gravel), cement, fly ash, and admixtures

13  are delivered and stored at the Facility.

14  94.  Waterkeeper is informed and believes, and thereon alleges, that raw

15  materials, including aggregate (rock, sand, and gravel), cement, fly ash, and admixtures

16  are mixed with water to create concrete at the Facility.

17  95.  Waterkeeper is informed and believes, and thereon alleges, that raw

18  materials, including aggregate (rock, sand, and gravel), cement, fly ash, water, and (if

19  applicable) admixtures are added to concrete haul trucks at the Facility that mix the

20  ingredients together to produce concrete that haul the concrete off site.

21  96.  Waterkeeper is informed and believes, and thereon alleges, that the concrete

22  production process at the Facility also includes onsite vehicle and mobile equipment

23  operation, parking, fueling, and maintenance.

24  97.  Waterkeeper is informed and believes, and thereon alleges, that the Facility

25  includes a batch plant.

26  98.  Waterkeeper is informed and believes, and thereon alleges, that the Facility

27  includes a fuel storage area.

28  99.  Waterkeeper is informed and believes, and thereon alleges, that the Facility

1   includes an industrial wastewater containment area.

2   100.   Waterkeeper is informed and believes, and thereon alleges, that the Facility
3   includes outdoor storage areas.

4   101.   Waterkeeper is informed and believes, and thereon alleges, that the Facility
5   includes cement silos.

6   102.   Waterkeeper is informed and believes, and thereon alleges, that the Facility
7   includes fly ash silos.

8   103.   Waterkeeper is informed and believes, and thereon alleges, that the Facility
9   includes admixture storage areas.

10   104.   Waterkeeper is informed and believes, and thereon alleges, that the Facility
11   includes aboveground storage tanks.

12   105.   Waterkeeper is informed and believes, and thereon alleges, that the Facility
13   includes a truck washing area.

14   106.   Waterkeeper is informed and believes, and thereon alleges, that the Facility
15   includes material unloading and loading areas.

16   107.   Waterkeeper is informed and believes, and thereon alleges, that the Facility
17   includes a maintenance shop.

18   **B.   The Facility's Storm Water Permit Coverage.**

19   108.   Waterkeeper is informed and believes, and thereon alleges, that the Facility
20   Owner and/or Operator obtained 1997 Permit coverage on March 19, 2004.

21   109.   Waterkeeper is informed and believes, and thereon alleges, that the Facility
22   Owner and/or Operator continues to have 2015 Permit coverage for the Facility.

23   110.   Waterkeeper is informed and believes, and thereon alleges, that the Facility
24   Owner and/or Operator submitted an NOI for the Facility in March 2004 ("2004 NOI").

25   111.   Waterkeeper is informed and believes, and thereon alleges, that the Facility
26   Owner and/or Operator submitted an NOI for the Facility on December 24, 2014 ("2014
27   NOI") to continue Storm Water Permit coverage for the Facility under the 2015 Permit.

28   112.   The 2004 NOI and the 2014 NOI list the Facility location as "6120 20th St,

Complaint                                    18

1   Riverside, CA 92509."

2   113.   The 2004 NOI and the 2014 NOI list the Facility operator as "Robertson's

3   Ready Mix."

4   114.   The State Board's electronic database, called the Storm Water Multiple

5   Application & Report Tracking System ("SMARTS"), lists the current Facility Waste

6   Discharge Identification ("WDID") number as 8 33I018708.

7   115.   SMARTS lists the Facility's coverage under the Storm Water Permit as

8   "Active."

9   116.   The 2004 NOI and 2014 NOI list the SIC code for the Facility as 3273

10   (Ready-Mix Concrete).

11   117.   Section 6.1 of the Facility SWPPP identifies mobile equipment operation,

12   fueling, and maintenance as industrial processes that are conducted at the Facility.

13   118.   Waterkeeper is informed and believes, and thereon alleges, that SIC code

14   4231 (terminal and joint terminal maintenance facilities for motor freight transportation)

15   applies to the Facility.

16   119.   Waterkeeper is informed and believes, and thereon alleges, that SIC code

17   4212 (local trucking without storage) applies to the Facility.

18   120.   A facility classified as SIC code 3273 requires Storm Water Permit coverage

19   for the entire facility. 1997 Permit, Attachment 1, Section 4; *see also* 2015 Permit,

20   Attachment A, ¶ 2.

21   121.   Waterkeeper is informed and believes, and thereon alleges, that the entire

22   Facility requires Storm Water Permit coverage because the industrial activities at the

23   Facility are classified as SIC code 3273.

24   122.   The 2004 NOI lists the Facility as 3.56 acres in size.

25   123.   The 2004 NOI lists the Facility as 16% impervious.

26   124.   The Building Material Industry Group Monitoring Plan lists the Facility as

27   3.56 acres.

28   125.   The Building Material Industry Group Monitoring Plan lists the Facility as

Complaint                          19

16% impervious.

126.   The 2014 NOI lists the Facility as "3.88 Sq.Feet."

127.   The 2014 NOI lists the industrial area exposed to storm water at the Facility as 31200 sq. feet (approximately 0.72 acres).

128.   The 2014 NOI does not list the percentage of imperviousness of the Facility.

129.   The Facility SWPPP lists the Facility as 3.31 acres.

130.   The Facility SWPPP lists the Facility as 90% impervious.

131.   Waterkeeper is informed and believes, and thereon alleges, that the 2014 NOI erroneously labeled the Facility size as "3.88 Sq.Feet" rather than 3.88 acres.

132.   Waterkeeper is informed and believes, and thereon alleges, that to the extent the 2014 NOI did not erroneously label the Facility size as "3.88 Sq.Feet" the Facility Owner and/or Operator has failed to obtain Storm Water Permit coverage for the entire Facility.

133.   Waterkeeper is informed and believes, and thereon alleges, that the 2014 NOI erroneously failed to list the percentage of imperviousness at the Facility.

**C.    Defendant's SWPPP and M&RP for the Facility.**

134.   The Facility SWPPP and M&RP publicly available via the SMARTS database is dated March 2015.

135.   Waterkeeper is informed and believes, and thereon alleges, that the SWPPP and M&RP dated March 2015 is the current SWPPP and M&RP for the Facility ("Facility SWPPP").

**D.    Industrial Activities, Pollutant Sources, Pollutants, and BMPs at the Facility.**

136.   Waterkeeper is informed and believes, and thereon alleges, that the Facility's industrial activities and areas of industrial activity are pollutant sources.

137.   Waterkeeper is informed and believes, and thereon alleges, that the Facility's industrial activities and areas include, but are not limited to: concrete mixing; transport of raw materials; unloading of raw materials; outdoor storage of raw materials,

1 including sand, gravel, rock, chemical admixtures, fly ash, and cement; fueling, repairing,

2 cleaning, and maintaining vehicles and equipment; storage of fuels and hazardous

3 materials, such as diesel fuel, lubricating fluids, new vehicle fluids, and hazardous waste

4 vehicle fluids; vehicle and equipment storage.

5      138.   Section 4 of the Facility SWPPP references Appendix A (figures), Figure 1

6 (site location map), and Figure 2 (site plan). However, the Facility SWPPP does not

7 include Appendix A, Figure 1, and Figure 2.

8      139.   Section 5 and Table 1 of the Facility SWPPP provide brief descriptions of

9 the areas where industrial activities are conducted at the Facility.

10      140.   Waterkeeper is informed and believes, and thereon alleges, that the Facility

11 SWPPP does not include all areas of industrial activity at the Facility.

12      141.   Waterkeeper is informed and believes, and thereon alleges, that the Facility

13 SWPPP does not adequately describe all industrial processes at the Facility.

14      142.   Waterkeeper is informed and believes, and thereon alleges, that the Facility

15 SWPPP does not adequately describe all dust and particulate generating activities.

16      143.   Waterkeeper is informed and believes, and thereon alleges, that a site map

17 dated February 12, 2015 ("February 12 map"), was uploaded to SMARTS on October 23,

18 2015, and that the February 12 map is a map of the Facility submitted pursuant to

19 Section II(B)(3)(a) of the 2015 Permit.

20      144.   Waterkeeper is informed and believes, and thereon alleges, that the Facility

21 SWPPP does not include a separate copy of the February 12 map or any other site map of

22 the Facility.

23      145.   Waterkeeper is informed and believes, and thereon alleges, that the

24 February 12 map does not identify all areas of industrial activity at the Facility.

25      146.   Waterkeeper is informed and believes, and thereon alleges, that the

26 February 12 map does not identify all discharge locations at the Facility.

27      147.   Waterkeeper is informed and believes, and thereon alleges, that the

28 February 12 map does not include locations and descriptions of structural control

1  measures that affect industrial storm water discharges.

2         148.   Waterkeeper is informed and believes, and thereon alleges, that the

3  February 12 map does not identify locations where materials are directly exposed to

4  precipitation.

5         149.   Waterkeeper is informed and believes, and thereon alleges, that the

6  February 12 map does not include notes, legends, and other data appropriate to ensure the

7  site map is clear, legible, and understandable.

8         150.   Waterkeeper is informed and believes, and thereon alleges, that industrial

9  activities occur throughout the Facility outdoors without adequate cover to prevent storm

10 water exposure to pollutant sources.

11        151.   Waterkeeper is informed and believes, and thereon alleges, that industrial

12 activities occur throughout the Facility outdoors without secondary containment or other

13 adequate treatment measures to prevent polluted storm water from discharging from the

14 Facility.

15        152.   Waterkeeper is informed and believes, and thereon alleges, that because the

16 Facility SWPPP fails to describe all of the Facility's industrial activities, the Facility

17 SWPPP also fails to describe all of the significant materials and processes that are related

18 to the Facility's industrial activities.

19        153.   Waterkeeper is informed and believes, and thereon alleges, that because all

20 significant materials have not been identified, the Facility SWPPP fails to describe the

21 locations where the materials are stored, received, shipped, and handled, or the typical

22 quantities and frequency of significant materials at the Facility.

23        154.   Section 5.0, Table 1, and Section 6.8 of the SWPPP identify potential

24 pollutants associated with the Facility's industrial activities.

25        155.   Waterkeeper is informed and believes, and thereon alleges, that the Facility

26 SWPPP fails to describe all of the pollutants associated with the Facility's industrial

27 activities.

28        156.   Waterkeeper is informed and believes, and thereon alleges, that the Facility

Complaint                                    22

Owner and/or Operator has failed and continues to fail to adequately assess pollutants associated with potential pollutant sources at the Facility.

157.   Waterkeeper is informed and believes, and thereon alleges, that the Facility SWPPP does not include an adequate assessment of pollutants associated with potential pollutant sources at the Facility.

158.   Waterkeeper is informed and believes, and thereon alleges, that pollutants associated with the Facility include, but are not limited to: pH-affecting substances; metals, such as iron and aluminum; toxic metals, such as lead, zinc, cadmium, chromium, copper, arsenic, and mercury; COD; BOD; TSS; benzene; gasoline and diesel fuels; fuel additives; coolants; antifreeze; TKN; trash; and O&G.

159.   Section 6.8 and Table 3 of the Facility SWPPP identifies the BMPs for the areas of industrial activity at the Facility.

160.   Section 8.0, Table 5, and Table 6 of the Facility SWPPP lists the BMPs at the Facility.

161.   Waterkeeper is informed and believes, and thereon alleges, that the Facility SWPPP fails to describe adequate BMPs to reduce or prevent pollutants in the Facility's discharges.

162.   Waterkeeper is informed and believes, and thereon alleges, that without properly identifying all industrial activities at the Facility in the SWPPP, the Facility Owner and/or Operator cannot and has not developed all appropriate BMPs.

163.   Waterkeeper is informed and believes, and thereon alleges, that without properly identifying all industrial activities at the Facility in the SWPPP, the Facility Owner and/or Operator cannot and has not implemented all appropriate BMPs.

164.   Waterkeeper is informed and believes, and thereon alleges, that without properly identifying all significant materials at the Facility in the SWPPP, the Facility Owner and/or Operator cannot and has not developed all appropriate BMPs.

165.   Waterkeeper is informed and believes, and thereon alleges, that without properly identifying all significant materials at the Facility in the SWPPP, the Facility

1  Owner and/or Operator cannot and has not implemented all appropriate BMPs.

2      166.   Waterkeeper is informed and believes, and thereon alleges, that the Facility

3  SWPPP does not include an adequate assessment of potential pollutant sources at the

4  Facility.

5      167.   Waterkeeper is informed and believes, and thereon alleges, that the Facility

6  Owner and/or Operator has failed and continues to fail to assess the Facility's BMPs

7  corresponding to potential pollutant sources and associated pollutants.

8      168.   Waterkeeper is informed and believes, and thereon alleges, that the Facility

9  SWPPP does not include an adequate assessment of the Facility's BMPs corresponding to

10  potential pollutant sources and associated pollutants.

11      169.   Waterkeeper is informed and believes, and thereon alleges, that the Facility

12  Owner and/or Operator has failed and continues to fail to assess potential pollutant

13  sources at the Facility.

14      170.   Waterkeeper is informed and believes, and thereon alleges, that the Facility

15  SWPPP does not include an adequate description of the Facility BMPs.

16      171.   Waterkeeper is informed and believes, and thereon alleges, that the Facility

17  Owner and/or Operator has failed and continues to fail to analyze the effectiveness of the

18  BMPs at the Facility.

19      172.   Waterkeeper is informed and believes, and thereon alleges, that the Facility

20  SWPPP does not include an adequate analysis of the effectiveness of the BMPs at the

21  Facility.

22      173.   Waterkeeper is informed and believes, and thereon alleges, that storm water

23  sampling at the Facility demonstrates that the Facility's storm water discharges contain

24  concentrations of pollutants above the Benchmark Levels, including, but not limited to:

25  aluminum, iron, pH, and TSS.

26      174.   Waterkeeper is informed and believes, and thereon alleges, that the repeated

27  and significant exceedances of Benchmark Levels demonstrate that the Facility Owner

28  and/or Operator failed and continues to fail to develop BMPs to prevent the exposure of

Complaint                          24

1   pollutants to storm water, and to prevent discharges of polluted storm water from the

2   Facility.

3       175.   Waterkeeper is informed and believes, and thereon alleges, that the repeated

4   and significant exceedances of Benchmark Levels demonstrate that the Facility Owner

5   and/or Operator failed and continues to fail to implement BMPs to prevent the exposure

6   of pollutants to storm water, and to prevent discharges of polluted storm water from the

7   Facility.

8       176.   Waterkeeper is informed and believes, and thereon alleges, that the Facility

9   Owner and/or Operator has failed and continues to fail to adequately revise the SWPPP.

10      **E.   Discharge Locations at the Facility.**

11      177.   In the SWPPP, the Facility Owner and/or Operator identifies one (1)

12  discharge point located at the Facility labeled as "Outfall #1."

13      178.   The Facility site map available on the SMARTS database shows Outfall #1

14  as located in the southeast corner of the Facility adjacent to the entrance/egress from the

15  Facility onto Van Dell Road, and depicts a "swale flow line" with flow arrows showing

16  that storm water from the entire Facility is routed by the swale to Outfall #1.

17      179.   Waterkeeper is informed and believes, and thereon alleges, that Outfall #1 is

18  a storm water discharge point at the Facility.

19      180.   In the 2012/2013 Annual Report, the 2014/2015 Annual Report, and the

20  Building Materials Industry Group Monitoring Plan for the Facility, the Facility Owner

21  and/or Operator reports that there are two (2) storm water discharge locations at the

22  Facility.

23      181.   Waterkeeper is informed and believes, and thereon alleges, that the driveway

24  onto 20th Street located in the northwest corner of the Facility is a discharge point at the

25  Facility.

26      182.   Waterkeeper is informed and believes, and thereon alleges, that the driveway

27  onto Van Dell Road in the southeast corner of the Facility is a discharge point at the

28  Facility.

183.   Waterkeeper is informed and believes, and thereon alleges, that the pollutants associated with the Facility have been and continue to be tracked throughout the Facility.

184.   Waterkeeper is informed and believes, and thereon alleges, that trucks and vehicles track sediment, dirt, oil and grease, metal particles, and other pollutants off-site via the driveways from the Facility onto 20th Street and Van Dell Road.

185.   Waterkeeper is informed and believes, and thereon alleges, that at least three (3) storm water discharge points exist at the Facility.

186.   Waterkeeper is informed and believes, and thereon alleges, that the SWPPP does not identify all discharge points.

### F.   The Facility's Discharges to the Receiving Waters.

187.   Waterkeeper is informed and believes, and thereon alleges, that the discharge points at the Facility lead to the municipal separate storm sewer system, which flows to the Santa Ana River and its tributaries (collectively the "Receiving Waters").

188.   Waterkeeper is informed and believes, and thereon alleges, that each of the Receiving Waters is a water of the United States.

189.   Waterkeeper is informed and believes, and thereon alleges, that polluted storm water and non-storm water discharges from the Facility to the Receiving Waters.

### G.   Defendant's Sampling, Monitoring, and Reporting.

190.   Via a Public Records Act request to the Regional Board, Waterkeeper obtained an Annual Report for the Facility dated June 1, 2011.

191.   Waterkeeper is informed and believes, and thereon alleges, that the Annual Report dated June 1, 2011, obtained from the Regional Board is the 2010/2011 Annual Report for the Facility.

192.   Via a Public Records Act request to the Regional Board, Waterkeeper obtained an Annual Report for the Facility dated May 28, 2012.

193.   Waterkeeper is informed and believes, and thereon alleges, that the Annual Report dated May 28, 2012, obtained from the Regional Board is the 2011/2012 Annual

1    Report for the Facility.

2        194.   Via a Public Records Act request to the Regional Board, Waterkeeper

3    obtained an Annual Report for the Facility dated May 27, 2013.

4        195.   Waterkeeper is informed and believes, and thereon alleges, that the Annual

5    Report dated May 27, 2013, obtained from the Regional Board is the 2012/2013 Annual

6    Report for the Facility.

7        196.   Via a Public Records Act request to the Regional Board, Waterkeeper

8    obtained an Annual Report for the Facility dated May 29, 2014.

9        197.   Waterkeeper is informed and believes, and thereon alleges, that the Annual

10   Report dated May 29, 2014, obtained from the Regional Board is the 2013/2014 Annual

11   Report for the Facility.

12       198.   Via a Public Records Act request to the Regional Board, Waterkeeper

13   obtained an Annual Report for the Facility dated May 15, 2015.

14       199.   Waterkeeper is informed and believes, and thereon alleges, that the Annual

15   Report dated May 15, 2015, obtained from the Regional Board is the 2014/2015 Annual

16   Report for the Facility.

17       200.   Waterkeeper refers to the above-described 2010/2011 Annual Report,

18   2011/2012 Annual Report, 2012/2013 Annual Report, 2013/2014 Annual Report, and

19   2014/2015 Annual Report collectively as Defendant's "Annual Reports."

20       2010/2011 Annual Report

21       201.   Waterkeeper is informed and believes, and thereon alleges, that Facility

22   Owner and/or Operator failed to include the required summary of its quarterly visual

23   observations of unauthorized non-storm water discharges for each of its drainage areas in

24   the 2010/2011 Annual Report.

25       202.   Waterkeeper is informed and believes, and thereon alleges, that the Facility

26   Owner and/or Operator failed to include the required evaluation of its quarterly visual

27   observations of unauthorized non-storm water discharges for each of its drainage areas in

28   the 2010/2011 Annual Report.

203.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to indicate the location of non-storm water visual observations to document which discharge areas were observed in the 2010/2011 Annual Report.

204.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to include the required summary of its monthly visual observations of storm water discharges for each of its discharge points in the 2010/2011 Annual Report.

205.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to include the required evaluation of its monthly visual observations of storm water discharges for each of its discharge points in the 2010/2011 Annual Report.

206.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to include the required summary of the presence of any floating and suspended material, O&G, discolorations, turbidity, odor, and source of pollutants at the unobserved discharge points in the 2010/2011 Annual Report.

207.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to include the required evaluation of the presence of any floating and suspended material, O&G, discolorations, turbidity, odor, and source of pollutants at the unobserved discharge points in the 2010/2011 Annual Report.

208.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to include the required summary of its quarterly visual observations of unauthorized non-storm water discharges for each of its drainage areas in the 2010/2011 Annual Report.

209.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to include the required evaluation of its quarterly visual observations of unauthorized non-storm water discharges for each of its drainage areas in the 2010/2011 Annual Report.

210.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owner and/or Operator certified that the Facility was in compliance with the Storm Water Permit in its 2010/2011 Annual Report.

211.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owner's and/or Operator's certification of compliance in the 2010/2011 Annual Report was false because it failed to comply with each of the requires of Section B(14) of the 1997 Permit.

212.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owner's and/or Operator's certification of compliance in the 2010/2011 Annual Report was false because the Facility Owner and/or Operator had not revised the Facility SWPPP to achieve compliance with the Storm Water Permit.

213.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owner's and/or Operator's certification of compliance in the 2010/2011 Annual Report was false because the Facility Owner and/or Operator had not revised the Facility M&RP to achieve compliance with the Storm Water Permit.

214.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to describe instances of the Facility's noncompliance with the Storm Water Permit in its 2010/2011 Annual Report.

215.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to include descriptions of steps taken to prevent recurrence of its noncompliance with the Storm Water Permit in its 2010/2011 Annual Report.

2011/2012 Annual Report

216.   Waterkeeper is informed and believes, and thereon alleges, that Facility Owner and/or Operator failed to include the required summary of its quarterly visual observations of unauthorized non-storm water discharges for each of its drainage areas in the 2011/2012 Annual Report.

217.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to include the required evaluation of its quarterly visual

Complaint                                    29

observations of unauthorized non-storm water discharges for each of its drainage areas in the 2011/2012 Annual Report.

218.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to indicate the location of non-storm water visual observations to document which discharge areas were observed in the 2011/2012 Annual Report.

219.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to include the required summary of its monthly visual observations of storm water discharges for each of its discharge points in the 2011/2012 Annual Report.

220.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to include the required evaluation of its monthly visual observations of storm water discharges for each of its discharge points in the 2011/2012 Annual Report.

221.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to include the required summary of the presence of any floating and suspended material, O&G, discolorations, turbidity, odor, and source of pollutants at the unobserved discharge points in the 2011/2012 Annual Report.

222.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to include the required evaluation of the presence of any floating and suspended material, O&G, discolorations, turbidity, odor, and source of pollutants at the unobserved discharge points in the 2011/2012 Annual Report.

223.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to include the required summary of its quarterly visual observations of unauthorized non-storm water discharges for each of its drainage areas in the 2011/2012 Annual Report.

224.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to include the required evaluation of its quarterly visual

observations of unauthorized non-storm water discharges for each of its drainage areas in the 2011/2012 Annual Report.

225.   Waterkeeper is informed and believes, and thereon alleges, that during the 2011/2012 Wet Season the Facility Owner and/or Operator failed to collect any storm water samples, despite the occurrence of at least one (1) qualifying rain event in the 2011/2012 Wet Season.

226.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owner and/or Operator did not report any storm water samples in its 2011/2012 Annual Report, despite the occurrence of at least one (1) qualifying rain event in that Wet Season.

227.   Waterkeeper is informed and believes, and thereon alleges, that per the applicable group monitoring plan during the 2011/2012 Wet Season the Facility Owner and/or Operator was required to collect at least one (1) storm water sample at the Facility, but failed to collect any storm water samples during the 2011/2012 Wet Season.

228.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to include the required summary of sampling results for all Facility discharge points in the 2011/2012 Annual Report.

229.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to analyze all storm water samples collected for all required parameters, including pollutants likely to be present in the Facility storm water discharges in significant quantities, such as aluminum and iron, during the 2011/2012 Wet Season.

230.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owner and/or Operator certified that the Facility was in compliance with the Storm Water Permit in its 2011/2012 Annual Report.

231.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owner's and/or Operator's certification of compliance in the 2011/2012 Annual Report was false because it failed to comply with each of the requires of Section B(14) of the

1   1997 Permit.

2        232.   Waterkeeper is informed and believes, and thereon alleges, that the Facility

3   Owner's and/or Operator's certification of compliance in the 2011/2012 Annual Report

4   was false because the Facility Owner and/or Operator had not revised the Facility

5   SWPPP to achieve compliance with the Storm Water Permit.

6        233.   Waterkeeper is informed and believes, and thereon alleges, that the Facility

7   Owner's and/or Operator's certification of compliance in the 2011/2012 Annual Report

8   was false because the Facility Owner and/or Operator had not revised the Facility M&RP

9   to achieve compliance with the Storm Water Permit.

10       234.   Waterkeeper is informed and believes, and thereon alleges, that the Facility

11   Owner and/or Operator failed to describe instances of the Facility's noncompliance with

12   the Storm Water Permit in its 2011/2012 Annual Report.

13       235.   Waterkeeper is informed and believes, and thereon alleges, that the Facility

14   Owner and/or Operator failed to include descriptions of steps taken to prevent recurrence

15   of its noncompliance with the Storm Water Permit in its 2011/2012 Annual Report.

16       2012/2013 Annual Report

17       236.   Waterkeeper is informed and believes, and thereon alleges, that Facility

18   Owner and/or Operator failed to include the required summary of its quarterly visual

19   observations of unauthorized non-storm water discharges for each of its drainage areas in

20   the 2012/2013 Annual Report.

21       237.   Waterkeeper is informed and believes, and thereon alleges, that the Facility

22   Owner and/or Operator failed to include the required evaluation of its quarterly visual

23   observations of unauthorized non-storm water discharges for each of its drainage areas in

24   the 2012/2013 Annual Report.

25       238.   Waterkeeper is informed and believes, and thereon alleges, that the Facility

26   Owner and/or Operator failed to indicate the location of non-storm water visual

27   observations to document which discharge areas were observed in the 2012/2013 Annual

28   Report.

Complaint                        32

239. Waterkeeper is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to include the required summary of its monthly visual observations of storm water discharges for each of its discharge points in the 2012/2013 Annual Report.

240. Waterkeeper is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to include the required evaluation of its monthly visual observations of storm water discharges for each of its discharge points in the 2012/2013 Annual Report.

241. Waterkeeper is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to include the required summary of the presence of any floating and suspended material, O&G, discolorations, turbidity, odor, and source of pollutants at the unobserved discharge points in the 2012/2013 Annual Report.

242. Waterkeeper is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to include the required evaluation of the presence of any floating and suspended material, O&G, discolorations, turbidity, odor, and source of pollutants at the unobserved discharge points in the 2012/2013 Annual Report.

243. Waterkeeper is informed and believes, and thereon alleges, that during the 2012/2013 Wet Season the Facility Owner and/or Operator failed to collect any storm water samples, despite the occurrence of at least one (1) qualifying rain event in the 2012/2013 Wet Season.

244. Waterkeeper is informed and believes, and thereon alleges, that the Facility Owner and/or Operator did not report any storm water samples in its 2012/2013 Annual Report, despite the occurrence of at least one (1) qualifying rain event in that Wet Season.

245. Waterkeeper is informed and believes, and thereon alleges, that per the applicable group monitoring plan during the 2012/2013 Wet Season the Facility Owner and/or Operator was required to collect at least one (1) storm water sample at the Facility, but failed to collect any storm water samples during the 2012/2013 Wet Season.

246.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to include the required summary of sampling results for all Facility discharge points in the 2012/2013 Annual Report.

247.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to analyze all storm water samples collected for all required parameters, including pollutants likely to be present in the Facility storm water discharges in significant quantities, such as aluminum and iron, during the 2012/2013 Wet Season.

248.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owner and/or Operator certified that the Facility was in compliance with the Storm Water Permit in its 2012/2013 Annual Report.

249.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owner's and/or Operator's certification of compliance in the 2012/2013 Annual Report was false because it failed to comply with each of the requires of Section B(14) of the 1997 Permit.

250.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owner's and/or Operator's certification of compliance in the 2012/2013 Annual Report was false because the Facility Owner and/or Operator had not revised the Facility SWPPP to achieve compliance with the Storm Water Permit.

251.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owner's and/or Operator's certification of compliance in the 2012/2013 Annual Report was false because the Facility Owner and/or Operator had not revised the Facility M&RP to achieve compliance with the Storm Water Permit.

252.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to describe instances of the Facility's noncompliance with the Storm Water Permit in its 2012/2013 Annual Report.

253.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to include descriptions of steps taken to prevent recurrence

of its noncompliance with the Storm Water Permit in its 2012/2013 Annual Report.

2013/2014 Annual Report

254.   Waterkeeper is informed and believes, and thereon alleges, that Facility Owner and/or Operator failed to include the required summary of its quarterly visual observations of unauthorized non-storm water discharges for each of its drainage areas in the 2013/2014 Annual Report.

255.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to include the required evaluation of its quarterly visual observations of unauthorized non-storm water discharges for each of its drainage areas in the 2013/2014 Annual Report.

256.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to indicate the location of non-storm water visual observations to document which discharge areas were observed in the 2013/2014 Annual Report.

257.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to include the required summary of its monthly visual observations of storm water discharges for each of its discharge points in the 2013/2014 Annual Report.

258.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to include the required evaluation of its monthly visual observations of storm water discharges for each of its discharge points in the 2013/2014 Annual Report.

259.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to include the required summary of the presence of any floating and suspended material, O&G, discolorations, turbidity, odor, and source of pollutants at the unobserved discharge points in the 2013/2014 Annual Report.

260.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to include the required evaluation of the presence of any

Complaint                                    35

floating and suspended material, O&G, discolorations, turbidity, odor, and source of pollutants at the unobserved discharge points in the 2013/2014 Annual Report.

261.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owner and/or Operator certified that the Facility was in compliance with the Storm Water Permit in its 2013/2014 Annual Report.

262.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owner's and/or Operator's certification of compliance in the 2013/2014 Annual Report was false because it failed to comply with each of the requires of Section B(14) of the 1997 Permit.

263.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owner's and/or Operator's certification of compliance in the 2013/2014 Annual Report was false because the Facility Owner and/or Operator had not revised the Facility SWPPP to achieve compliance with the Storm Water Permit.

264.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owner's and/or Operator's certification of compliance in the 2013/2014 Annual Report was false because the Facility Owner and/or Operator had not revised the Facility M&RP to achieve compliance with the Storm Water Permit.

265.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to describe instances of the Facility's noncompliance with the Storm Water Permit in its 2013/2014 Annual Report.

266.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to include descriptions of steps taken to prevent recurrence of its noncompliance with the Storm Water Permit in its 2013/2014 Annual Report.

2014/2015 Annual Report

267.   Waterkeeper is informed and believes, and thereon alleges, that Facility Owner and/or Operator failed to include the required summary of its quarterly visual observations of unauthorized non-storm water discharges for each of its drainage areas in the 2014/2015 Annual Report.

268.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to include the required evaluation of its quarterly visual observations of unauthorized non-storm water discharges for each of its drainage areas in the 2014/2015 Annual Report.

269.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to indicate the location of non-storm water visual observations to document which discharge areas were observed in the 2014/2015 Annual Report.

270.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to include the required summary of its monthly visual observations of storm water discharges for each of its discharge points in the 2014/2015 Annual Report.

271.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to include the required evaluation of its monthly visual observations of storm water discharges for each of its discharge points in the 2014/2015 Annual Report.

272.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to include the required summary of the presence of any floating and suspended material, O&G, discolorations, turbidity, odor, and source of pollutants at the unobserved discharge points in the 2014/2015 Annual Report.

273.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to include the required evaluation of the presence of any floating and suspended material, O&G, discolorations, turbidity, odor, and source of pollutants at the unobserved discharge points in the 2014/2015 Annual Report.

274.   Waterkeeper is informed and believes, and thereon alleges, that during the 2014/2015 Wet Season the Facility Owner and/or Operator failed to collect any storm water samples, despite the occurrence of at least one (1) qualifying rain event in the 2014/2015 Wet Season.

275.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owner and/or Operator did not report any storm water samples in its 2014/2015 Annual Report, despite the occurrence of at least one (1) qualifying rain event in that Wet Season.

276.   Waterkeeper is informed and believes, and thereon alleges, that per the applicable group monitoring plan during the 2014/2015 Wet Season the Facility Owner and/or Operator was required to collect at least one (1) storm water sample at the Facility, but failed to collect any storm water samples during the 2014/2015 Wet Season.

277.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to include the required summary of sampling results for all Facility discharge points in the 2014/2015 Annual Report.

278.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to analyze all storm water samples collected for all required parameters, including pollutants likely to be present in the Facility storm water discharges in significant quantities, such as aluminum and iron, during the 2014/2015 Wet Season.

279.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owner and/or Operator certified that the Facility was in compliance with the Storm Water Permit in its 2014/2015 Annual Report.

280.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owner's and/or Operator's certification of compliance in the 2014/2015 Annual Report was false because it failed to comply with each of the requires of Section B(14) of the 1997 Permit.

281.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owner's and/or Operator's certification of compliance in the 2014/2015 Annual Report was false because the Facility Owner and/or Operator had not revised the Facility SWPPP to achieve compliance with the Storm Water Permit.

282.   Waterkeeper is informed and believes, and thereon alleges, that the Facility

Owner's and/or Operator's certification of compliance in the 2014/2015 Annual Report was false because the Facility Owner and/or Operator had not revised the Facility M&RP to achieve compliance with the Storm Water Permit.

283.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to describe instances of the Facility's noncompliance with the Storm Water Permit in its 2014/2015 Annual Report.

284.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to include descriptions of steps taken to prevent recurrence of its noncompliance with the Storm Water Permit in its 2014/2015 Annual Report.

## V.      CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

**Defendant's Discharges of Contaminated Storm Water in Violation of the Storm Water Permit Effluent Limitations and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

285.   Waterkeeper incorporates the allegations contained in the above paragraphs as though fully set forth herein.

286.   Waterkeeper is informed and believes, and thereon alleges, that Defendant failed and continues to fail to reduce or prevent pollutants associated with industrial activities at the Facility from discharging from the Facility through implementation of BMPs that achieve BAT/BCT.

287.   Waterkeeper is informed and believes, and thereon alleges, that discharges of storm water containing levels of pollutants that do not achieve compliance with BAT/BCT standards from the Facility occur every time storm water discharges from the. Defendant's failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a violation of the Storm Water Permit and the CWA. *See* 1997 Permit, Effluent Limitation B(3); 2015 Permit, Section I(D) (Finding 32), Effluent Limitation V(A); 33 U.S.C. § 1311(b).

288.   The Facility Owner and/or Operator violates and will continue to violate the Storm Water Permit Effluent Limitations each and every time storm water containing levels of pollutants that do not achieve BAT/BCT standards discharges from the Facility.

289.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owner's and/or Operator's violations of Effluent Limitations of the Storm Water Permit and the Clean Water Act are ongoing and continuous.

290.   Each and every violation of the Storm Water Permit Effluent Limitations is a separate and distinct violation of section 301(a) of the CWA, 33 U.S.C. § 1311(a).

291.   By committing the acts and omissions alleged above, the Owner and/or Operator is subject to an assessment of civil penalties for each and every violation of the CWA occurring from February 25, 2011, to the present, pursuant to sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

292.   An action for injunctive relief is authorized by CWA section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs and the citizens of the State of California, for which harm Waterkeeper has no plain, speedy, or adequate remedy at law.

293.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiffs pray for judgment against Defendant as set forth hereafter.

## SECOND CAUSE OF ACTION

**Defendant's Discharges of Contaminated Storm Water in Violation of Storm Water Permit Receiving Water Limitations and the Clean Water Act.**

### 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)

294.   Waterkeeper incorporates the allegations contained in the above paragraphs as though fully set forth herein.

295.   Waterkeeper is informed and believes, and thereon alleges, that discharges

of storm water containing levels of pollutants that adversely impact human health and/or the environment from the Facility occur each time storm water discharges from the Facility.

296.   Waterkeeper is informed and believes, and thereon alleges, that storm water containing levels of pollutants that cause or contribute to exceedances of water quality standards has discharged and continues to discharge from the Facility each time storm water discharges from the Facility.

297.   The Facility Owner and/or Operator violates and will continue to violate the Storm Water Permit Receiving Water Limitations each and every time storm water containing levels of pollutants that adversely impact human health and/or the environment, and that cause or contribute to exceedances of WQS, discharges from the Facility.

298.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owner's and/or Operator's violations of Receiving Water Limitations of the Storm Water Permit and the CWA are ongoing and continuous.

299.   Each and every violation of the Storm Water Permit Receiving Water Limitations is a separate and distinct violation of section 301(a) of the CWA, 33 U.S.C. § 1311(a).

300.   By committing the acts and omissions alleged above, the Facility Owner and/or Operator is subject to an assessment of civil penalties for each and every violation of the CWA occurring from February 25, 2011, to the present, pursuant to sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

301.   An action for injunctive relief under the Clean Water Act is authorized by section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs, Plaintiffs' members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

302.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because

Complaint                                    41

an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiffs pray for judgment against Defendant as set forth hereafter.

### THIRD CAUSE OF ACTION

**Defendant's Discharges of Non-Storm Water in Violation of the Storm Water Permit and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

303.   Waterkeeper incorporates the allegations contained in the above paragraphs as though fully set forth herein.

304.   Waterkeeper is informed and believes, and thereon alleges, that prohibited non-storm water discharges have discharged and continue to discharge from the Facility, in violation of the Storm Water Permit and/or CWA section 301(a). 33 U.S.C. § 1311(a).

305.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owner's and/or Operator's violations of Discharge Prohibitions of the Storm Water Permit are ongoing and continuous.

306.   Each and every violation of the Storm Water Permit's Discharge Prohibitions is a separate and distinct violation of section 301(a) of the CWA, 33 U.S.C. § 1311(a).

307.   By committing the acts and omissions alleged above, the Facility Owner and/or Operator is subject to an assessment of civil penalties for each and every violation of the CWA occurring from February 25, 2011, to the present, pursuant to sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

308.   An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs, Plaintiffs' members, and the citizens of the State of California, for which harm they has no plain, speedy, or adequate remedy at law.

309.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiffs pray for judgment against Defendant as set forth hereafter.

### FOURTH CAUSE OF ACTION

**Defendant's Failure to Adequately Develop, Implement, and/or Revise a Storm Water Pollution Prevention Plan in Violation of the Storm Water Permit and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

310.   Waterkeeper incorporates the allegations contained in the above paragraphs as though fully set forth herein.

311.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owner and/or Operator has failed and continues to fail to develop an adequate SWPPP for the Facility, in violation of the Storm Water Permit.

312.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owner and/or Operator has failed and continues to fail to adequately implement a SWPPP for the Facility, in violation of the Storm Water Permit.

313.   Waterkeeper is informed and believes, and thereon alleges, that Facility Owner and/or Operator has failed and continues to fail to adequately revise a SWPPP for the Facility, in violation of the Storm Water Permit.

314.   The Facility Owner and/or Operator has been in violation of the Storm Water Permit at the Facility every day from February 25, 2011, to the present.

315.   The Facility Owner's and/or Operator's violations of the Storm Water Permit and the CWA at the Facility are ongoing and continuous.

316.   The Facility Owner and/or Operator will continue to be in violation of the Storm Water Permit and the CWA each and every day the Facility Owner and/or Operator fails to adequately develop, implement, and/or revise the SWPPP for the Facility.

317.   Each and every violation of the Storm Water Permit SWPPP requirements at the Facility is a separate and distinct violation of the CWA.

318.   By committing the acts and omissions alleged above, the Facility Owner and/or Operator is subject to an assessment of civil penalties for each and every violation of the CWA occurring from August 18, 2010 to the present, pursuant to sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

319.   An action for injunctive relief under the CWA is authorized by section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Waterkeeper, its members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

320.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiffs pray for judgment against the Defendant as set forth hereafter.

## FIFTH CAUSE OF ACTION

### Defendant's Failure to Adequately Develop, Implement, and/or Revise a Monitoring and Reporting Program in Violation of the Storm Water Permit and the Clean Water Act.

### 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)

321.   Waterkeeper incorporates the allegations contained in the above paragraphs as though fully set forth herein.

322.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owner and/or Operator has failed and continues to fail to develop an adequate M&RP for the Facility, in violation of the Storm Water Permit.

323.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owner and/or Operator has failed and continues to fail to adequately implement an M&RP for the Facility, in violation of the Storm Water Permit.

324.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owner and/or Operator has failed and continues to fail to adequately revise an M&RP for

1  the Facility, in violation of the Storm Water Permit.

2      325.   The Facility Owner and/or Operator has been in violation of the Storm

3  Water Permit's monitoring requirements at the Facility every day from February 25,

4  2011, to the present.

5      326.   The Facility Owner's and/or Operator's violations of the Storm Water

6  Permit's monitoring requirements and the CWA at the Facility are ongoing and

7  continuous.

8      327.   The Facility Owner and/or Operator will continue to be in violation of

9  Section B and Provision E(3) the 1997 Permit, Section XI of the 2015 Permit, and the

10  CWA each and every day it fails to adequately develop, implement, and/or revise an

11  M&RP for the Facility.

12      328.   Each and every violation of the Storm Water Permit M&RP requirements at

13  the Facility is a separate and distinct violation of the CWA.

14      329.   By committing the acts and omissions alleged above, the Facility Owner

15  and/or Operator is subject to an assessment of civil penalties for each and every violation

16  of the CWA occurring from February 25, 2011, to the present, pursuant to sections

17  309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

18      330.   An action for injunctive relief under the CWA is authorized by section

19  505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and

20  omissions alleged above would irreparably harm Waterkeeper, its members, and the

21  citizens of the State of California, for which harm they have no plain, speedy, or adequate

22  remedy at law.

23      331.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because

24  an actual controversy exists as to the rights and other legal relations of the Parties.

25      WHEREFORE, Plaintiffs pray judgment against the Defendant as set forth

26  hereafter.

27  ///

28  ///

Complaint                    45

**SIXTH CAUSE OF ACTION**

**Defendant's Failure to Report as Required by the Storm Water Permit in Violation of the Storm Water Permit and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

332.   Waterkeeper incorporates the allegations contained in the above paragraphs as though fully set forth herein.

333.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owner and/or Operator has failed and continues to fail to submit accurate Annual Reports to the Regional Board, in violation of Sections B(14), C(9), and C(10) of the 1997 Permit.

334.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owner's and/or Operator's Annual Reports failed to meet the monitoring and reporting requirements of the Storm Water Permit, in violation of Section B(14) of the 1997 Permit.

335.   Waterkeeper is informed and believes, and thereon alleges, that based on the above-described violations of the Storm Water Permit the Facility Owner's and/or Operator's annual reports submitted pursuant to the 2015 Permit will fail to meet the requirements of Section XVI(B) of the 2015 Permit.

336.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owner and/or Operator has failed to submit complete Annual Reports to the Regional Board, in violation of Sections B(14), C(9), C(10) and C(11) of the 1997 Permit.

337.   The Facility Owner and/or Operator has been in violation of Sections B(14), C(9), C(10), and/or C(11) of the 1997 Permit and CWA every day since at least February 25, 2011.

338.   The Facility Owner's and/or Operator's violations of the reporting requirements of the Storm Water Permit and the CWA are ongoing and continuous.

339.   By committing the acts and omissions alleged above, the Facility Owner

and/or Operator is subject to an assessment of civil penalties for each and every violation of the CWA occurring from February 25, 2011, to the present, pursuant to sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

340.   An action for injunctive relief under the CWA is authorized by section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Waterkeeper, its members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

341.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiffs pray judgment against the Defendant as set forth hereafter.

## VI.   RELIEF REQUESTED

342.   Plaintiffs respectfully request that this Court grant the following relief:

a.   A Court order declaring the Defendant to have violated and to be in violation of sections 301(a) and (b) of the Clean Water Act, 33 U.S.C. §§ 1311(a) and (b); for discharging pollutants from the Facility in violation of a permit issued pursuant to section 402(p) of the CWA, 33 U.S.C. § 1342(p), for failing to meet effluent limitations which include BAT/BCT requirements, and for failing to comply with the substantive and procedural requirements of the Storm Water Permit.

b.   A Court order enjoining Defendant from discharging pollutants without an NPDES permit;

c.   A Court order requiring Defendant to implement affirmative injunctive measures designed to eliminate Defendant's violations of the substantive and procedural requirements of the Storm Water Permit and the Clean Water Act;

d.   A Court order assessing civil monetary penalties for each violation of the CWA at $37,500 per day per violation for violations occurring since February 25, 2011, as permitted by CWA section 309(d), 33 U.S.C. § 1319(d) and 40 C.F.R. § 19.4;

1       e.     A Court order awarding Plaintiffs their reasonable costs of suit, including

2   attorney, witness, expert, and consultant fees, as permitted by section 505(d) of the Clean

3   Water Act, 33 U.S.C. § 1365(d); and

4       f.     Any other relief as this Court may deem appropriate.

5

6   Dated: April 25, 2016                  Respectfully submitted,

7                                      LAWYERS FOR CLEAN WATER, INC.

8

9

10

11                                      Caroline Koch

11                                      Attorney for Plaintiffs

12                                      Inland Empire Waterkeeper and Orange

13                                      County Coastkeeper

**Exhibit A**



Inland Empire Waterkeeper
*Advocacy • Education • Restoration • Enforcement*

6876 Indiana Avenue, Suite D
Riverside, CA 92506
Phone (951) 530-8823
Fax (951) 530-8824
Website www.iewaterkeeper.org

February 18, 2016

**VIA CERTIFIED MAIL**

Robertson's Riverside Plant
Attn: Managing Agent
6120 20th Street
Riverside, California 92509

Robertson's Ready Mix, Ltd., a California
Limited Partnership
200 S. Main Street
Suite 200
Corona, California 92882-2212

RRM Properties, Ltd., a California Limited
Partnership
200 S. Main Street
Suite 200
Corona, California 92882

Mitsubishi Materials Corporation
11250 Slater Avenue
Fountain Valley, California 92708

Mervyn Encarnacion
Registered Agent for Service of Process for
RRM Properties, Ltd., a California Limited
Partnership
200 S. Main Street, Suite 200
Corona, California 92882

Mervyn Encarnacion
Registered Agent for Service of Process for
Robertson's Ready Mix, Ltd., a California
Limited Partnership
200 S. Main Street, Suite 200
Corona, California 92882

Theodore J. Roper
c/o Freeman Freeman and Smiley, LLP
Registered Agent for Service of Process for
Mitsubishi Materials Corporation
1888 Century Park East
Suite 1900
Los Angeles, California 90067

> **Re:    Notice of Violation and Intent to File Suit Under the Clean Water Act**

To Whom It May Concern:

I am writing on behalf of Inland Empire Waterkeeper and Orange County Coastkeeper
(collectively "Waterkeeper") regarding violations of the Clean Water Act[1] and California's

---

[1] Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.*

Notice of Violation and Intent to File Suit
February 18, 2016
Page 2 of 21

Industrial Storm Water Permit[2] ("Storm Water Permit") occurring at the industrial facility with its main address at: 6120 20th Street, Riverside, California 92509 ("Facility"). The purpose of this letter is to put Robertson's Riverside Plant, Robertson's Ready Mix, Ltd., a California Limited Partnership, and RRM Properties, Ltd., a California Limited Partnership ("Robertson's"), as the owners and/or operators of the Facility, on notice of the violations of the Storm Water Permit occurring at the Facility, including, but not limited to, discharges of polluted storm water from the Facility into local surface waters. Violations of the Storm Water Permit are violations of the Clean Water Act. As explained below, Robertson's is liable for violations of the Storm Water Permit and the Clean Water Act.

Section 505(b) of the Clean Water Act, 33 U.S.C. § 1365(b), requires that sixty (60) days prior to the initiation of a civil action under Section 505(a) of the Clean Water Act, 33 U.S.C. § 1365(a), a citizen must give notice of his/her intention to file suit. The Clean Water Act requires that notice must be given to the alleged violator, the Administrator of the United States Environmental Protection Agency ("EPA"), the Regional Administrator of the EPA, the Executive Officer of the water pollution control agency in the State in which the violations occur, and, if the alleged violator is a corporation, the registered agent of the corporation. *See* 40 C.F.R. § 135.2(a)(1).

This letter is being sent to you as the responsible owner and operator of the Facility, or as the registered agent for this entity. This notice letter ("Notice Letter") is issued pursuant to 33 U.S.C. §§ 1365(a) and (b) of the Clean Water Act to inform Robertson's that Waterkeeper intends to file a federal enforcement action against Robertson's for violations of the Storm Water Permit and the Clean Water Act sixty (60) days from the date of this Notice Letter.

I.    **BACKGROUND**

A.    **Inland Empire Waterkeeper and Orange County Coastkeeper**

Inland Empire Waterkeeper's office is located at 6876 Indiana Avenue, Suite D, Riverside, California 92506. Inland Empire Waterkeeper is a program of Orange County Coastkeeper. Orange County Coastkeeper is a non-profit public benefit corporation organized under the laws of the State of California with its office at 3151 Airway Avenue, Suite F-110, Costa Mesa, California 92626. Together, Inland Empire Waterkeeper and Orange County Coastkeeper have over 2,000 members who live and/or recreate in and around the Santa Ana River watershed. Waterkeeper is dedicated to the preservation, protection, and defense of the environment, wildlife, and natural resources of the Inland Empire watershed. To further these goals, Waterkeeper actively seeks federal and state agency implementation of the Clean Water Act and other environmental regulations, and, where necessary, directly initiates enforcement actions on behalf of itself and its members.

---

[2] National Pollution Discharge Elimination System ("NPDES") General Permit No. CAS000001, Water Quality Order No. 92-12-DWQ, Order No. 97-03-DWQ, as amended by Order No. 2015-0057-DWQ.

Members of Waterkeeper use and enjoy the waters that Robertson's discharges into, including the Santa Ana River and its tributaries. Members of Waterkeeper use and enjoy the Santa Ana River and its tributaries to swim, wade, picnic, hike, view wildlife, and engage in scientific study including monitoring activities. The discharge of pollutants and emissions of fugitive dust from the Facility impairs each of these uses. Further, discharges of polluted storm water and fugitive dust emissions from the Facility are ongoing and continuous. Thus, the interests of Waterkeeper's members have been, are being, and will continue to be adversely affected by Robertson's failure to comply with the Clean Water Act and the Storm Water Permit.

### B.     The Owners and/or Operators of the Facility

Information available to Waterkeeper indicates that Robertson's Ready Mix, Ltd., is an owner and/or operator of the Facility. Robertson's Ready Mix, Ltd. is an active California limited partnership and its registered agent is: Mervyn Encarnacion, 200 S. Main Street, Suite 200, Corona, California 92882. Pursuant to California Corporations Code section 15904.04, Robertson's Ready Mix, Ltd.'s general partners are jointly and severally liable for the Clean Water Act violations described herein, and Waterkeeper will include Robertson's Ready Mix, Ltd.'s general partners when that information becomes available. Further, to the extent Robertson's Ready Mix, Ltd.'s limited partners own and/or operate the Facility together with Robertson's Ready Mix, Ltd., Waterkeeper will include those limited partners when that information becomes available.

Information available to Waterkeeper indicates that RRM Properties, Ltd., a California Limited Partnership, is an owner and/or operator of the Facility. RRM Properties, Ltd., a California Limited Partnership is an active California limited partnership and its registered agent is: Mervyn Encarnacion, 200 S. Main Street, Suite 200, Corona, California 92882. Pursuant to California Corporations Code section 15904.04, RRM Properties, Ltd.'s general partners are jointly and severally liable for the Clean Water Act violations described herein, and Waterkeeper will include RRM Properties, Ltd.'s general partners when that information becomes available. Further, to the extent RRM Properties, Ltd. limited partners own and/or operate the Facility together with RRM Properties, Ltd., Waterkeeper will include those limited partners when that information becomes available.

Information available to Waterkeeper indicates that Mitsubishi Materials Corporation is the parent company of Robertson's and is an owner and/or operator of the Facility. Mitsubishi Materials Corporation is an active California corporation and its registered agent is: Theodore J. Roper, c/o Freeman Freeman and Smiley, LLP, 1888 Century Park East, Suite 1900, Los Angeles, California 90067.

Waterkeeper refers to Robertson's Riverside Plant, Robertson's Ready Mix, Ltd., RRM Properties Ltd., and Mitsubishi Materials Corporation together as the "Facility Owners and/or Operators." The Facility Owners and/or Operators have violated and continue to violate the procedural and substantive terms of the Storm Water Permit including, but not limited to, the illegal discharge of pollutants from the Facility into local surface waters. As explained herein,

Notice of Violation and Intent to File Suit
February 18, 2016
Page 4 of 21

the Facility Owners and/or Operators are liable for violations of the Storm Water Permit and the
Clean Water Act.

### C.    The Facility's Storm Water Permit Coverage

Facilities that discharge storm water associated with specified industrial activities are
required to apply for coverage under the Storm Water Permit by submitting a Notice of Intent
("NOI") to the State Water Resources Control Board ("State Board") to obtain Storm Water
Permit coverage. *See* Storm Water Permit, Finding #12.

Robertson's obtained Storm Water Permit coverage on March 19, 2004. The NOI
submitted in March 2004 ("2004 NOI") identifies the owner/operator of the Facility as
"Robertsons Ready Mix" and the Facility name and location as "Robertsons Riverside Plant,
6120 20th St, Riverside, CA 92509." The 2004 NOI lists the Facility as 3.56 acres in size and
16% impervious. On December 24, 2014, Robertson's submitted an NOI to continue the
Facility's coverage under the Permit ("2014 NOI"). The 2014 NOI identifies the owner/operator
of the Facility as "Robertsons Ready Mix" and the Facility name and location as "Robertsons
Riverside Plant, 6120 20th St, Riverside, CA 92509." The 2014 NOI lists the Facility as "3.88
Sq.Feet," the industrial area exposed to storm water is listed as 31200 sq. feet (approximately
0.72 acres), and the percentage of imperviousness is not listed. The 2004 and 2014 NOIs list the
Waste Discharge Identification ("WDID") number for the Facility as 8 33I018708.

Given the information in the 2004 NOI and the Facility Storm Water Pollution
Prevention Plan ("SWPPP")[3] as to the Facility size, Waterkeeper assumes that the identification
of "3.88 square feet" in the 2014 NOI as the Facility size is an error and that Robertson's
intended to identify the Facility size as "3.88 acres." Waterkeeper puts Robertson's on notice that
the 2014 NOI is incorrect, or, alternatively, to the extent the use of "square feet" is not an error,
that Robertson's has failed to obtain Storm Water Permit coverage for the entire Facility, as
required by the Storm Water Permit.

The 2004 and 2014 NOIs list the Standard Industrial Classification ("SIC") code for the
Facility as 3273 (Ready-Mix Concrete). Information available to Waterkeeper, including the
Facility SWPPP describing vehicle and equipment maintenance and storage at the Facility,
indicates that SIC code 4231 (terminal and joint terminal maintenance facilities for motor freight
transportation) and/or 4212 (local trucking without storage) apply to the Facility.

### D.    Storm Water Pollution and the Waters Receiving Robertson's Discharges

With every significant rainfall event millions of gallons of polluted storm water
originating from industrial operations such as the Facility pour into storm drains and local
waterways. The consensus among agencies and water quality specialists is that storm water

---

[3] The Facility SWPPP publicly available via the SMARTS database is dated March 2015. Waterkeeper
also obtained the March 2015 SWPPP via a Public Records Act request. Waterkeeper understands that the
March 2015 is the current SWPPP for the Facility.

pollution accounts for more than half of the total pollution entering surface waters each year. Such discharges of pollutants from industrial facilities contribute to the impairment of downstream waters and aquatic dependent wildlife. These contaminated discharges can and must be controlled for the ecosystem to regain its health.

Based on EPA's Industrial Storm Water Fact Sheet for Glass, Clay, Cement, Concrete, and Gypsum Product Manufacturing Facilities, polluted discharges from concrete mixing facilities such as the Facility contain pH affecting substances; metals, such as iron and aluminum; toxic metals, such as lead, zinc, cadmium, chromium, copper, arsenic, and mercury; chemical oxygen demand ("COD"); biological oxygen demand ("BOD"); total suspended solids ("TSS"); benzene; gasoline and diesel fuels; fuel additives; coolants; antifreeze; total kjehldahl nitrogen ("TKN"); trash; and oil and grease ("O&G"). Many of these pollutants are on the list of chemicals published by the State of California as known to cause cancer, birth defects, and/or developmental or reproductive harm. Discharges of polluted storm water to the Santa Ana River and its tributaries pose carcinogenic and reproductive toxicity threats to the public and adversely affect the aquatic environment.

The Facility discharges into Reach 4 of the Santa Ana River ("Receiving Waters"), which is an ecologically sensitive area. Although pollution and habitat destruction have drastically diminished once-abundant and varied fisheries, these waters are still essential habitat for dozens of fish and bird species as well as macro-invertebrate and invertebrate species. Storm water and non-storm water contaminated with sediment, heavy metals, and other pollutants harm the special aesthetic and recreational significance that the Receiving Waters have for people in the surrounding communities. The public's use of local waterways exposes many people to toxic metals and other contaminants in storm water discharges. Non-contact recreational and aesthetic opportunities, such as wildlife observation, are also impaired by polluted discharges to the Receiving Waters.

The California Regional Water Quality Control Board, Santa Ana Region Regional Board ("Regional Board") issued the *Santa Ana River Basin Water Quality Control Plan* ("Basin Plan"). The Basin Plan identifies the "Beneficial Uses" of water bodies in the region. The Beneficial Uses for the Santa Ana River downstream of the point at which it receives storm water discharges from the Facility (i.e., Santa Ana River Reaches 1-4) include: Agricultural Supply; Groundwater Recharge; Water Contact Recreation; Non-contact Water Recreation; Warm Freshwater Habitat; Wildlife Habitat; and Rare, Threatened or Endangered Species. *See* Basin Plan at Table 3-1. According to the 2010 303(d) List of Impaired Water Bodies, Reach 4 of the Santa Ana River is impaired for pathogens, Reach 3 is impaired for copper, lead, and pathogens, and Reach 2 is impaired for indicator bacteria.[4] Polluted discharges from industrial sites, such as the Facility, contribute to the degradation of these already impaired surface waters and aquatic-dependent wildlife that depends on these waters.

---

[4] 2010 Integrated Report – All Assessed Waters, *available at* http://www.waterboards.ca.gov/water_issues/programs/tmdl/integrated2010.shtml (last accessed on April 4, 2015).

## II.    THE FACILITY AND ASSOCIATED DISCHARGES OF POLLUTANTS

### A.   The Facility Site Description and Industrial Activities

Information available to Waterkeeper indicates the Facility is located at 6120 20th Street, Riverside, California 92509, which is approximately 1 mile north of the 60 freeway and Rubidoux Blvd. exit, as well as approximately 1 mile northwest of the Santa Ana River. The Facility is bordered by another ready-mixed concrete facility to the northwest.

The Facility is an active concrete batch plant. Raw materials, including aggregate (rock, sand, and gravel), cement[5], fly ash, and admixtures are delivered to the Facility, and are mixed with water to create concrete. These materials, water, and (if applicable) admixtures are added to concrete haul trucks that mix the ingredients together to produce concrete and haul the concrete off site. The concrete production process also includes onsite vehicle and mobile equipment operation, parking, fueling, and maintenance.

Based on Waterkeeper's review of the SWPPP and other publicly available documents, the Facility includes a batch plant, a fuel storage area, an industrial waste water containment area, outdoor storage areas, cement silos, fly ash silos, admixture storage areas, aboveground storage tanks, a truck washing area, material unloading and loading areas, and a maintenance shop.

The Facility's industrial activities include, but are not limited to: concrete mixing; transport of raw materials; unloading of raw materials; outdoor storage of raw materials, including sand, gravel, rock, chemical admixtures, fly ash, and cement; fueling, repairing, cleaning, and maintaining vehicles and equipment; storage of fuels and hazardous materials, such as diesel fuel, lubricating fluids, new vehicle fluids, and hazardous waste vehicle fluids; vehicle and equipment storage.

### B.   Pollutants Associated with Robertson's Industrial Activities

The pollutants associated with operations at the Facility include, but are not limited to: pH-affecting substances[6]; metals, such as iron and aluminum; toxic metals, such as lead, zinc,

---

[5] Based on Waterkeeper's review of the Facility SWPPP, cement is stored in "cement storage silos" in the concrete batch plant area of the Facility, and that cement is received in this area. To the extent cement is stored outdoors, storm water discharges from the Facility may be subject to additional effluent limitations set out at 40 C.F.R. § 411.30. Waterkeeper will add additional information and/or violations relevant to the Facility Owners and/or Operators' storage and handling of cement as that information becomes available to Waterkeeper.

[6] Storm water discharged with high pH can damage the gills and skin of aquatic organisms and cause death at levels above 10 standard units. The pH scale is logarithmic and the solubility of a substance varies as a function of the pH of a solution. A one whole unit change in SU represents a tenfold increase or decrease in ion concentration. If the pH of water is too high or too low, the aquatic organisms living within it will become stressed or die.

cadmium, chromium, copper, arsenic, and mercury; COD; BOD; TSS[7]; benzene; gasoline and diesel fuels; fuel additives; coolants; antifreeze; TKN; trash; and O&G.

Information available to Waterkeeper indicates Robertson's has not properly developed and/or implemented the required best management practices ("BMPs") to address pollutant sources and contaminated discharges. BMPs are necessary at the Facility to prevent the exposure of pollutants to precipitation and the subsequent discharge of polluted storm water from the Facility during rain events. Consequently, during rain events storm water carries pollutants from the Facility's stockpile or material storage area(s), truck parking area(s), fueling and maintenance area(s), add-mix area(s), batch plant area(s), washing area(s), and other areas into the storm sewer system, which flows into the Receiving Waters, in violation of the Storm Water Permit.

Information available to Waterkeeper also indicates that concrete, particulates, and fugitive dust of sand, gravel, and cement have been and continue to be tracked from vehicle maintenance and equipment washing areas throughout the Facility. These pollutants accumulate at the sand and gravel storage areas and near the silos, the loading and unloading areas, and the driveways leading onto 20th Street. As a result, trucks and vehicles leaving the Facility via the driveways are pollutant sources tracking sediment, dirt, O&G, metal particles, and other pollutants off-site.

Information available to Waterkeeper indicates that raw materials are stored outside and weighing and mixing activities occur outside without adequate cover or containment resulting in discharges of polluted storm water and fugitive dust emissions. Additionally, metal parts and hazardous materials associated with maintenance, fueling, and washing of the concrete trucks occur outside without secondary containment or other measures to prevent polluted storm water and prohibited non-storm water discharges from discharging from the Facility. These activities are all significant pollutant sources at the Facility.

Robertson's failure to develop and/or implement required BMPs also results in prohibited discharges of non-storm water in violation of the Storm Water Permit and the Clean Water Act. Information available to Waterkeeper indicates that Robertson's discharges process waters from equipment washing and other activities as part of its industrial operations.

---

[7] High concentrations of TSS degrade optical water quality by reducing water clarity and decreasing light available to support photosynthesis. TSS has been shown to alter predator prey relationships (for example, turbid water may make it difficult for fish to hunt prey). Deposited solids alter fish habitat, aquatic plants, and benthic organisms. TSS can also be harmful to aquatic life because numerous pollutants, including metals and polycyclic aromatic hydrocarbons, are absorbed onto TSS. Thus, higher concentrations of TSS results in higher concentrations of toxins associated with those sediments. Inorganic sediments, including settleable matter and suspended solids, have been shown to negatively impact species richness, diversity, and total biomass of filter feeding aquatic organisms on bottom surfaces.

### C.  Facility Storm Water Flows and Discharge Locations

In the SWPPP, the Facility Owners and/or Operators identify one (1) discharge point located at the Facility labeled as "Outfall #1" on the site map. As shown on the site map, Outfall #1 is located in the southeast corner of the Facility adjacent to the entrance/egress from the Facility onto Van Dell Road. The Facility's site map depicts a "swale flow line" with flow arrows showing that storm water from the entire Facility is routed by the swale to Outfall #1.

However, information available to Waterkeeper including the Facility Owners and/or Operators' 2012-2013 Annual Report, Waterkeeper's field investigations, and wet weather observations, indicates that at least two (2) other storm water discharge points exist at the Facility, including the driveway onto 20th Street located in the northwest corner of the Facility and the driveway onto Van Dell Road in the southeast corner of the Facility. All discharge points lead to the municipal separate storm sewer system, which flows to the Santa Ana River.

The Facility Owner and/or Operators also report that there is a detention basin on the Facility that collects storm water, but no sizing information is provided. And an inspection report summarizing an inspection conducted by the Regional Board on January 31, 2012, demonstrates that storm water discharges from the Facility notwithstanding the detention basin. Based on information available to Waterkeeper, the detention basin does not contain all storm water at the Facility and that storm water polluted by the industrial activities at the Facility discharges to the Receiving Waters from the Facility discharge locations.[8]

## III.  VIOLATIONS OF THE CLEAN WATER ACT AND THE STORM WATER PERMIT

In California, any person who discharges storm water associated with industrial activity must comply with the terms of the Storm Water Permit in order to lawfully discharge pollutants. *See* 33 U.S.C. §§ 1311(a), 1342; 40 C.F.R. § 122.26(c)(1); *see also* Storm Water Permit, Fact Sheet at VII.

Between 1997 and June 30, 2015, the Storm Water Permit in effect was Order No. 97-03-DWQ, which Waterkeeper refers to as the "1997 Permit." On July 1, 2015, pursuant to Order No. 2015-0057-DWQ the Storm Water Permit was reissued. For purposes of this Notice Letter, Waterkeeper refers to the reissued permit as the "2015 Permit." The 2015 Permit superseded the 1997 Permit, except for enforcement purposes, and its terms are as stringent, or more stringent, than the terms of the 1997 Permit. *See* 2015 Permit, Findings, ¶ 6. Accordingly, Robertson's is liable for violations of the 1997 Permit and ongoing violations of the 2015 Permit, and civil penalties and injunctive relief are available remedies. *See Illinois v. Outboard Marine, Inc.*, 680 F.2d 473, 480-81 (7th Cir. 1982*) (relief granted for violations of an expired permit); *Sierra Club*

---

[8] To the extent Robertson's intends to retain storm water associated with industrial activities on the Facility in an effort to terminate its current Permit coverage, Waterkeeper puts Robertson's on notice that it has not met the requirements of Section XX.C. of the Storm Water Permit, and that any discharges from the Facility not in compliance with the Storm Water Permit are violations of Sections 301(a) and 402(p) of the Clean Water Act.

*v. Aluminum Co. of Am.*, 585 F. Supp. 842, 853-54 (N.D.N.Y. 1984) (holding that the Clean Water Act's legislative intent and public policy favor allowing penalties for violations of an expired permit); *Pub. Interest Research Group of N.J. v. Carter-Wallace, Inc.*, 684 F. Supp. 115, 121-22 (D.N.J. 1988) ("Limitations of an expired permit, when those limitations have been transferred unchanged to the newly issued permit, may be viewed as currently in effect").

### A.   Unauthorized Non-Storm Water Discharges from the Robertson's Facility in Violation of Storm Water Permit Discharge Prohibitions

Except as authorized by Special Conditions D(1) of the 1997 Permit, Discharge Prohibition A(1) prohibits permittees from discharging materials other than storm water (non-storm water discharges) either directly or indirectly to waters of the United States. The 2015 Permit includes the same discharge prohibition. *See* 2015 Permit, Discharge Prohibition III.B. Prohibited non-storm water discharges must be either eliminated or permitted by a separate NPDES permit. *See* Storm Water Permit, Discharge Prohibition A(1); *see also* 2015 Permit, Discharge Prohibition III.B.

Information available to Waterkeeper indicates that unauthorized non-storm water discharges occur at the Facility due to inadequate BMP development and/or implementation necessary to prevent these discharges. For example, unauthorized non-storm water discharges from the Facility during concrete and water truck filling, road watering, and/or when truck washing and cleaning activities occur. The Facility Owners and/or Operators conduct these activities without BMPs to prevent resulting non-storm water discharges. Non-storm water discharges resulting from these activities are not from sources that are listed among the authorized non-storm water discharges in the Storm Water Permit and thus are always prohibited.

Waterkeeper puts the Facility Owners and/or Operators on notice that the Storm Water Permit Discharge Prohibitions are violated each time unauthorized non-storm water is discharged from the Facility. *See* 1997 Permit, Discharge Prohibition A(1); *see also* 2015 Permit, Discharge Prohibition III.B. These discharge violations are ongoing and will continue until the Facility Owners and/or Operators develop and implement BMPs that prevent prohibited non-storm water discharges or obtain separate NPDES permit coverage. Each time the Facility Owners and/or Operators discharge prohibited non-storm water in violation of Discharge Prohibition A(1) of the 1997 Permit and Discharge Prohibition III.B. of the 2015 Permit is a separate and distinct violation of the Storm Water Permit and section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). Waterkeeper will update the number and dates of violations when additional information becomes available. Facility Owners and/or Operators are subject to civil penalties for all violations of the Clean Water Act occurring since February 18, 2011.

Notice of Violation and Intent to File Suit
February 18, 2016
Page 10 of 21

### B.   Discharges of Polluted Storm Water from the Facility in Violation of Storm Water Permit Effluent Limitations

Effluent Limitation B(3) of the 1997 Permit requires dischargers to reduce or prevent pollutants associated with industrial activity in storm water discharges through implementation of BMPs that achieve Best Available Technology Economically Achievable ("BAT") for toxic[9] and non-conventional pollutants and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.[10] The 2015 Permit includes the same effluent limitation. *See* 2015 Permit, Effluent Limitation V.A.

Information available to Waterkeeper, including its review of publicly available information and observations, BMPs that achieve BAT/BCT have not been implemented at the Facility. Consistent with Waterkeeper's review of available information and direct observations, the analytical results of storm water sampling at the Facility demonstrate that the Facility Owners and/or Operators have failed and continue to fail to implement BAT/BCT, as required. Specifically, Facility discharges have exceeded EPA Benchmarks for numerous pollutants. EPA Benchmarks are relevant and objective standards for evaluating whether a permittee's BMPs achieve compliance with BAT/BCT standards as required by Effluent Limitation B(3) of the 1997 Permit and Effluent Limitation V.A. of the 2015 Permit.[11] The table in Exhibit 1 sets forth the results of sampling at the Facility conducted by Waterkeeper as well as Robertson's. For example, a storm water sample collected by Waterkeeper on December 12, 2014, contained 3.7 mg/L of iron, 3.7 times higher than the EPA Benchmark for iron, and 2.8 mg/L of aluminum, 3.8 times higher than the EPA Benchmark for aluminum. The repeated and significant exceedances of EPA Benchmarks as set forth in Exhibit 1 demonstrates that the Facility Owners and/or Operators have failed and continue to fail to develop and/or implement BMPs at the Facility as required to achieve compliance with the BAT/BCT standards.

Waterkeeper puts the Facility Owners and/or Operators on notice that the Storm Water Permit Effluent Limitations are violated each time storm water discharges from the Facility. *See, e.g.*, Exhibit 2 (setting forth dates of rain events resulting in a discharge at the Facility).[12] These discharge violations are ongoing and will continue every time Robertson's discharges polluted storm water without developing and/or implementing BMPs that achieve compliance with the BAT/BCT standards. Waterkeeper will update the dates of violations when additional

---

[9] Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others.

[10] Conventional pollutants are listed at 40 C.F.R. § 401.16 and include biochemical oxygen demand, TSS, oil and grease, pH, and fecal coliform.

[11] *See United States Environmental Protection Agency (EPA) National Pollutant Discharge Elimination System (NPDES) Multi-Sector General Permit for Stormwater Discharges Associated with Industrial Activity (MSGP) Authorization to Discharge Under the National Pollutant Discharge Elimination System*, as modified effective February 26, 2009 ("Multi-Sector Permit"), Fact Sheet at 106; *see also*, 65 Federal Register 64839 (2000).

[12] Dates of significant rain events are measured at the Colton Fire Department Rain Gauge and the Riverside Municipal Airport Rain Gauge. A significant rain event is defined by EPA as a rainfall event generating 0.1 inches or more of rainfall, which generally results in discharges at a typical industrial facility.

information and data become available. Each time Robertson's discharges polluted storm water in violation of Effluent Limitation B(3) of the 1997 Permit and Effluent Limitation V.A. of the 2015 Permit is a separate and distinct violation of the Storm Water Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). The Facility Owners and/or Operators are subject to civil penalties for all violations of the Clean Water Act occurring since February 18, 2011.

Further, Waterkeeper puts the Facility Owners and/or Operators on notice that 2015 Permit Effluent Limitation V.A. is a separate, independent requirement with which Robertson's must comply, and that carrying out the iterative process triggered by exceedances of the Numeric Action Levels ("NALs") listed at Table 2 of the 2015 Permit does not amount to compliance with Effluent Limitation V.A. While exceedances of the NALs demonstrate that a facility is among the worst performing facilities in the State, such as the Facility, the NALs do not represent technology based criteria relevant to determining whether an industrial facility has implemented BMPs that achieve BAT/BCT.[13] And even if the Facility Owners and/or Operators submit any Exceedance Response Action Plan(s) pursuant to Section XII. of the 2015 Permit, the violations of Effluent Limitation V.A. described in this Notice Letter are ongoing.

### C. Discharges of Polluted Storm Water from the Facility in Violation of Storm Water Permit Receiving Water Limitations

Receiving Water Limitation C(2) of the 1997 Permit prohibits storm water discharges and authorized non-storm water discharges that cause or contribute to an exceedance of an applicable Water Quality Standard ("WQS").[14] The 2015 Permit includes the same receiving water limitation. *See* 2015 Permit, Receiving Water Limitation VI.A. Discharges that contain pollutants in excess of an applicable WQS violate the Storm Water Permit Receiving Water Limitations. *See* 1997 Permit, Receiving Water Limitation C(2); 2015 Permit, Receiving Water Limitation VI.A.

Receiving Water Limitation C(1) of the 1997 Permit prohibits storm water discharges and authorized non-storm water discharges to surface water that adversely impact human health or the environment. The 2015 Permit includes the same receiving water limitation. *See* 2015 Permit, Receiving Water Limitation VI.B. Discharges that contain pollutants in concentrations that

---

[13] "The NALs are not intended to serve as technology-based or water quality-based numeric effluent limitations. The NALs are not derived directly from either BAT/BCT requirements or receiving water objectives. NAL exceedances defined in [the 2015] Permit are not, in and of themselves, violations of [the 2015] Permit." 2015 Permit, Finding 63, p. 11. The NALs do, however, trigger reporting requirements. *See* 2015 Permit, Section XII.

[14] The Basin Plan designates Beneficial Uses for the Receiving Waters. Water quality standards are pollutant concentration levels determined by the state or federal agencies to be protective of designated Beneficial Uses. Discharges above water quality standards contribute to impairment of Receiving Waters' Beneficial Uses. Applicable water quality standards include, among others, the Criteria for Priority Toxic Pollutants in the State of California, 40 C.F.R. § 131.38 ("CTR"), and water quality objectives in the Basin Plan. Industrial storm water discharges must strictly comply with water quality standards, including those criteria listed in the applicable basin plan. *See Defenders of Wildlife v. Browner*, 191 F.3d 1159, 1166-67 (9th Cir. 1999).

Notice of Violation and Intent to File Suit
February 18, 2016
Page 12 of 21

exceed levels known to adversely impact aquatic species and the environment constitute violations of the Storm Water Permit Receiving Water Limitations. *See* 1997 Permit, Receiving Water Limitation C(1); 2015 Permit, Receiving Water Limitation VI.B.

Storm water sampling at the Facility demonstrates that discharges contain concentrations of pollutants that cause or contribute to a violation of an applicable WQS. For example, a storm water sample collected on December 12, 2014, had a pH of 10.4 s.u., nearly 100 times the Basin Plan criteria range for pH. These exceedances of WQS demonstrate that Robertson's has violated and continues to violate the Storm Water Permit Receiving Water Limitations. *See* 1997 Permit, Receiving Water Limitation C(2); 2015 Permit, Receiving Water Limitation VI.A.

As explained herein, the Receiving Waters are impaired, and thus unable to support the designated beneficial uses, for some of the same pollutants discharging from the Facility. The 2010 303(d) List of Impaired Water Bodies lists the Santa Ana River as impaired for multiple pollutants. Information available to Waterkeeper indicates that the Facility's storm water discharges contain elevated concentrations of pollutants, such as aluminum, iron and pH, which can be acutely toxic and/or have sub-lethal impacts on the avian and aquatic wildlife in the Santa Ana River. *See* Exhibit 1. Discharges of elevated concentrations of pollutants in the storm water from the Facility also adversely impact human health. These harmful discharges from the Facility are violations of the Storm Water Permit Receiving Water Limitations. *See* 1997 Permit, Receiving Water Limitation C(1); 2015 Permit, Receiving Water Limitation VI.B.

Waterkeeper puts the Facility Owners and/or Operators on notice that Storm Water Permit Receiving Water Limitations are violated each time polluted storm water discharges from the Facility. *See, e.g.*, Exhibit 2. These discharge violations are ongoing and will continue every time contaminated storm water is discharged in violation of the Storm Water Permit Receiving Water Limitations. Each time discharges of storm water from the Facility cause or contribute to a violation of an applicable WQS is a separate and distinct violation of Receiving Water Limitation C(2) of the 1997 Permit, Receiving Water Limitation VI.A. of the 2015 Permit VI.A, and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). Each time discharges from the Facility adversely impact human health or the environment is a separate and distinct violation of Receiving Water Limitation C(1) of the 1997 Permit, Receiving Water Limitation VI.B. of the 2015 Permit, and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). Waterkeeper will update the dates of violation when additional information and data becomes available. The Facility Owners and/or Operators are subject to civil penalties for all violations of the Clean Water Act occurring since February 18, 2011.

Further, Waterkeeper puts the Facility Owners and/or Operators on notice that 2015 Permit Receiving Water Limitations are separate, independent requirements with which Robertson's must comply, and that carrying out the iterative process triggered by exceedances of the NALs listed at Table 2 of the 2015 Permit does not amount to compliance with the Receiving Water Limitations. While exceedances of the NALs demonstrate that a facility is among the worst performing facilities in the State, such as the Facility, the NALs do not represent water quality based criteria relevant to determining whether an industrial facility has caused or

contributed to an exceedance of a water quality standard.[15] And even if the Facility Owners and/or Operators submit any Exceedance Response Action Plan(s) pursuant to Section XII. of the 2015 Permit, the violations of the Receiving Water Limitations described in this Notice Letter are ongoing.

### D. Failure to Develop, Implement, and/or Revise an Adequate Storm Water Pollution Prevention Plan

The Storm Water Permit requires permittees to develop and implement Storm Water Pollution Prevention Plans prior to conducting, and in order to continue, industrial activities. The specific SWPPP requirements of the 1997 Permit and the 2015 Permit are set out below.

#### 1. 1997 SWPPP Requirements

Section A(1) and Provision E(2) of the 1997 Permit require dischargers to have developed and implemented a SWPPP by October 1, 1992, or prior to beginning industrial activities, that meets all of the requirements of the Storm Water Permit. The objectives of the 1997 Permit SWPPP requirement are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges from the Facility, and to implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in storm water discharges. *See* 1997 Permit, Section A(2). These BMPs must achieve compliance with the Storm Water Permit's Effluent Limitations and Receiving Water Limitations.

To ensure compliance with the Storm Water Permit, the SWPPP must be evaluated on an annual basis pursuant to the requirements of Section A(9) of the 1997 Permit, and must be revised as necessary to ensure compliance with the Storm Water Permit. 1997 Permit, Sections A(9) and (10). Sections A(3) – A(10) of the 1997 Permit set forth the requirements for a SWPPP. Among other requirements, the SWPPP must include: a site map showing the facility boundaries, storm water drainage areas with flow patterns, nearby water bodies, the location of the storm water collection, conveyance and discharge system, structural control measures, areas of actual and potential pollutant contact, areas of industrial activity, and other features of the facility and its industrial activities (*see* 1997 Permit, Section A(4)); a list of significant materials handled and stored at the site (*see* 1997 Permit, Section A(5)); a description of potential pollutant sources, including industrial processes, material handling and storage areas, dust and particulate generating activities, significant spills and leaks, non-storm water discharges and their sources, and locations where soil erosion may occur (*see* 1997 Permit, Section A(6)).

---

[15] "The NALs are not intended to serve as technology-based or water quality-based numeric effluent limitations. The NALs are not derived directly from either BAT/BCT requirements or receiving water objectives. NAL exceedances defined in [the 2015] Permit are not, in and of themselves, violations of [the 2015] Permit." 2015 Permit, Finding 63, p. 11. The NALs do, however, trigger reporting requirements. *See* 2015 Permit, Section XII.

Sections A(7) and A(8) of the 1997 Permit require an assessment of potential pollutant sources at the facility and a description of the BMPs to be implemented at the facility that will reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges, including structural BMPs where non-structural BMPs are not effective.

2. 2015 SWPPP Requirements

As with the SWPPP requirements of the 1997 Permit, Sections X(A) - (H) of the 2015 Permit require dischargers to have developed and implemented a SWPPP that meets all of the requirements of the 2015 Permit. *See also* 2015 Permit, Appendix 1. The objective of the SWPPP requirements are still to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, and to implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in storm water discharges. *See* 2015 Permit, Section X(C).

The SWPPP must include, among other things and consistent with the 1997 Permit, a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutants control measures; a description of the BMPs developed and implemented to reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges necessary to comply with the Storm Water Permit; the identification and elimination of non-storm water discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities, and; the identification of individuals and their current responsibilities for developing and implementing the SWPPP. 2015 Permit, Section X(A)-(H).

Further, the 2015 Permit requires the discharger to evaluate the SWPPP on an annual basis and revise it as necessary to ensure compliance with the Storm Water Permit. 2015 Permit, Section X(A)-(B). Like the 1997 Permit, the 2015 Permit also requires that the discharger conduct an annual comprehensive site compliance evaluation that includes a review of all visual observation records, inspection reports and sampling and analysis results, a visual inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system, a review and evaluation of all BMPs to determine whether the BMPs are adequate, properly implemented and maintained, or whether additional BMPs are needed, and a visual inspection of equipment needed to implement the SWPPP. 2015 Permit, Section X(B) and Section XV.

3. The Facility Owners and/or Operators Have Violated and Continue to Violate the Storm Water Permit SWPPP Requirements

Information available to Waterkeeper indicates that the Facility Owners and/or Operators have been and continues to conduct operations at the Facility with an inadequately developed

and/or implemented SWPPP.[16] For example, in violation of Section A(4) of the 1997 Permit and Section X(E)(3) of the 2015 Permit, the site map fails to identify all areas of industrial activity, and all discharge locations.

Further, the narrative portions of the SWPPP fail to include all sources of unauthorized non-storm water discharges in violation of Section A(6) of the 1997 Permit and Section X(G)(1)(e) of the 2015 Permit. The SWPPP also fails to include an adequate assessment of potential pollutant sources or BMPs that achieve the BAT/BCT standards, as required by Section A(6) of the 1997 Permit and Sections X(G) and X(H) of the 2015 Permit.

The Facility Owners and/or Operators also fail to address all areas of industrial activity and/or all areas of pollutant sources and corresponding pollutants by claiming in the 2014 NOI that only "31200 sq ft" of the Facility include industrial activities that are exposed to storm water. To the extent there are areas of the Facility where industrial activities, in fact, do not occur, the Facility Owners and/or Operators have failed to comply with the certification requirements set out at Section XVII(E)(1) of the 2015 Permit that would allow Robertson's to exclude certain areas from its storm water management program. Nor have the Facility Owners and/or Operators revised the Facility SWPPP, as required by Section A(7) of the 1997 Permit and Section X(D)(2)(a) of the 2015 Permit.

The Facility Owners and/or Operators have failed and continue to fail to adequately develop, implement, and/or revise a SWPPP, in violation of SWPPP requirements of the Storm Water Permit. Every day the Facility operates with an inadequately developed, implemented, and/or properly revised SWPPP is a separate and distinct violation of the Storm Water Permit and the Clean Water Act. The Facility Owners and/or Operators have been in daily and continuous violation of the Storm Water Permit's SWPPP requirements since at least February 18, 2011. These violations are ongoing, and Waterkeeper will include additional violations when information becomes available. The Facility Owners and/or Operators are subject to civil penalties for all violations of the Clean Water Act occurring since February 18, 2011.

## E.   Failure to Develop, Implement, and/or Revise an Adequate Monitoring and Reporting Program

The Storm Water Permit requires permittees to develop and implement storm water monitoring and reporting programs ("M&RPs") prior to conducting, and in order to continue, industrial activities. The specific M&RP requirements of the 1997 Permit and the 2015 Permit are set out below.

### 1.   1997 Permit Requirements

Section B(1) and Provision E(3) of the 1997 Permit require facility operators to develop and implement an adequate M&RP by October 1, 1992, or prior to the commencement of industrial activities at a facility, that meets all of the requirements of the Storm Water Permit.

---

[16] The SWPPP for the Facility available via the SMARTs database is dated March 2015.

The primary objective of the M&RP is to detect and measure the concentrations of pollutants in a facility's discharge to ensure compliance with the Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. *See* 1997 Permit, Section B(2).

The M&RP must therefore ensure that BMPs are effectively reducing and/or eliminating pollutants at the facility, and must be evaluated and revised whenever appropriate to ensure compliance with the Storm Water Permit. *Id*. Sections B(3) – B(16) of the 1997 Permit set forth the M&RP requirements. Specifically, Section B(3) requires dischargers to conduct quarterly visual observations of all drainage areas within their facility for the presence of authorized and unauthorized non-storm water discharges. Section B(4) requires dischargers to conduct visual observations of storm water discharges from one storm event per month during the Wet Season. Sections B(3) and B(4) further require dischargers to document the presence of any floating or suspended material, oil and grease, discolorations, turbidity, odor, and the source of any pollutants. Dischargers must maintain records of observations, observation dates, locations observed, and responses taken to eliminate unauthorized non-storm water discharges and to reduce or prevent pollutants from contacting non-storm water and storm water discharges. *See* 1997 Permit, Sections B(3) and B(4). Dischargers must revise the SWPPP in response to these observations to ensure that BMPs are effectively reducing and/or eliminating pollutants at the facility. *Id*., Section B(4). Sections B(5) and B(7) of the 1997 Permit require dischargers to visually observe and collect samples of storm water from all locations where storm water is discharged.

The Facility was and/or is a member of the Building Materials Industry Group Monitoring Program, and thus the Facility Owners and/or Operators must comply with the group monitoring provisions set forth in Section B(15) of the 1997 Permit. Under Section B(15) of the 1997 Permit, the Facility Owners and/or Operators must collect at least two (2) samples from each discharge point at the Facility over a five (5) year period. *See* 1997 Permit, Sections B(5), B(7), and B(15). Storm water samples must be analyzed for TSS, pH, specific conductance ("SC"), total organic carbon or O&G, and other pollutants that are likely to be present in the facility's discharges in significant quantities, such as aluminum and nitrate plus nitrite. *See* Storm Water Permit, Section B(5)(c). The 1997 Permit requires facilities classified as SIC code 3273, such as the Facility, to also analyze storm water samples for iron. *Id*.; *see also* 1997 Permit, Table D, Sector E.

Section B(7)(d) of the 1997 Permit allows for the reduction of sampling locations in very limited circumstances when "industrial activities and BMPs within two or more drainage areas are substantially identical." If a discharger seeks to reduce sampling locations, the "[f]acility operators must document such a determination in the annual report." *Id*.

2. 2015 Permit Requirements

As with the 1997 M&RP requirements, Sections X(I) and XI(A)-XI(D) of the 2015 Permit require facility operators to develop and implement an adequate M&RP that meets all of the requirements of the 2015 Permit. The objective of the M&RP is still to detect and measure the concentrations of pollutants in a facility's discharge, and to ensure compliance with the 2015

Notice of Violation and Intent to File Suit
February 18, 2016
Page 17 of 21

Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. *See* 2015 Permit, Section XI. An adequate M&RP ensures that BMPs are effectively reducing and/or eliminating pollutants at the facility, and is evaluated and revised whenever appropriate to ensure compliance with the Storm Water Permit. *See id*.

As an *increase* in observation frequency than the 1997 Permit, Section XI(A) of the 2015 Permit requires all visual observations at least once each month, and at the same time sampling occurs at a discharge location. Observations must document the presence of any floating and suspended material, O&G, discolorations, turbidity, odor and the source of any pollutants. 2015 Permit, Section XI(A)(2). Dischargers must document and maintain records of observations, observation dates, locations observed, and responses taken to reduce or prevent pollutants in storm water discharges. 2015 Permit, Section XI(A)(3).

Section XI(B)(1-5) of the 2015 Permit requires permittees to collect storm water discharge samples from a qualifying storm event[17] as follows: 1) from each discharge location, 2) from two storm events within the first half of each reporting year[18] (July 1 to December 31), 3) from two storm events within the second half of each reporting year (January 1 to June 30), and 4) within four hours of the start of a discharge, or the start of facility operations if the qualifying storm event occurs within the previous 12-hour period. Section XI(B)(11) of the 2015 Permit, among other requirements, provides that permittees must submit all sampling and analytical results for all samples via SMARTS within 30 days of obtaining all results for each sampling event.

The parameters to be analyzed are also consistent with the 1997 Permit. Specifically, Section XI(B)(6)(a)-(b) of the 2015 Permit requires permitees to analyze samples for TSS, oil & grease, and pH. Section XI(B)(6)(c) of the 2015 Permit requires permitees to analyze samples for pollutants associated with industrial operations. Section XI(B)(6) of the 2015 Permit also requires dischargers to analyze storm water samples for additional applicable industrial parameters related to receiving waters with 303(d) listed impairments, or approved Total Maximum Daily Loads.

3.  <u>The Facility Owners and/or Operators Have Violated and Continue to Violate the Storm Water Permit M&RP Requirements</u>

The Facility Owners and/or Operators have been and continue to conduct operations at the Facility with an inadequately developed, implemented, and/or revised M&RP. For example, the Facility Owners and/or Operators have failed and continue to fail to conduct all required quarterly and/or monthly visual observations of unauthorized discharges. *See* 1997 Permit, Section B(3); *see also* 2015 Permit, Section XI(A)(1). Additionally, the Facility Owners and/or Operators have failed to provide the records required by the Storm Water Permit for the monthly visual observations of storm water discharges in violation of Section B(4) of the 1997 Permit and

---

[17] The 2015 Permit defines a qualifying storm event as one that produces a discharge for at least one drainage area, and is preceded by 48-hours with no discharge from any drainage areas. 2015 Permit, Section XI(B)(1).

[18] A reporting year is defined as July 1 through June 30. 2015 Permit, Findings, ¶ 62(b).

Notice of Violation and Intent to File Suit
February 18, 2016
Page 18 of 21

Section XI(A)(3) of the 2015 Permit.

The Facility Owners and/or Operators also failed to collect and analyze storm water samples as required by the Storm Water Permit. For example, for the past five (5) years the Facility Owners and/or Operators have not collected any storm water samples in violation of Sections B(5), B(7), and B(15) of the 1997 Permit. Specifically, pursuant to the applicable group monitoring plan, the Facility Owners and/or Operators were required to collect samples in the 2009/2010, 2011/2012, and 2012/2013 wet seasons. While the Facility Owners and/or Operators state in the 2012/2013 and 2013/2014 Annual Reports that the Facility "is a construction based business and during inclement weather our facility is closed," Waterkeeper has observed and has obtained publicly available information demonstrating that, in fact, the Facility does operate during storm events. That the Facility operates during storm events is further demonstrated by the fact that the Facility Owners and/or Operators recently collected storm water samples from the Facility.

In fact, Robertson's collected its first storm water sample for the Facility on September 15, 2015, and another sample on January 5, 2016. However, the Facility Owners and/or Operators failed to analyze September 15 and January 5 samples for all required contaminants, including pH and aluminum, in violation of Section XI(B)(6) of the 2015 Permit. *See* Exh. 1.

The Facility Owners' and/or Operators' failure to conduct sampling and monitoring as required by the Storm Water Permit demonstrates that it has failed to develop, implement, and/or revise an M&RP that complies with the requirements of Storm Water Permit. Every day that the Facility Owners and/or Operators conduct operations in violation of the specific monitoring requirements of the Storm Water Permit, or with an inadequately developed and/or implemented M&RP, is a separate and distinct violation of the Storm Water Permit and the Clean Water Act. The Facility Owners and/or Operators have been in daily and continuous violation of the Storm Water Permit's M&RP requirements every day since at least February 18, 2011. These violations are ongoing, and Waterkeeper will include additional violations when information becomes available. The Facility Owners and/or Operators are subject to civil penalties for all violations of the Clean Water Act occurring since February 18, 2011.

## F.   **Failure to Comply with the Storm Water Permit's Reporting Requirements**

Section B(14) of the 1997 Permit requires a permittee to submit an Annual Report to the Regional Board by July 1 of each year. Section B(14) requires that the Annual Report include a summary of visual observations and sampling results, an evaluation of the visual observation and sampling results, the laboratory reports of sample analysis, the annual comprehensive site compliance evaluation report, an explanation of why a permittee did not implement any activities required, and other information specified in Section B(13). The 2015 Permit includes the same annual reporting requirement. *See* 2015 Permit, Section XVI.

The Facility Owners and/or Operators have failed and continue to fail to submit Annual Reports that comply with these reporting requirements. For example, in each Annual Report since the filing of the 2010-2011 Annual Report, the Facility Owners and/or Operators certified

Notice of Violation and Intent to File Suit
February 18, 2016
Page 19 of 21

that: (1) a complete Annual Comprehensive Site Compliance Evaluation was done pursuant to Section A(9) of the Storm Water Permit; (2) the SWPPP's BMPs address existing potential pollutant sources; and (3) the SWPPP complies with the Storm Water Permit, or will otherwise be revised to achieve compliance. However, information available to Waterkeeper indicates that these certifications are erroneous. For example, as discussed above, storm water samples collected from the Facility contain concentrations of pollutants above Benchmark Levels, thus demonstrating that the SWPPP's BMPs do not adequately address existing potential pollutant sources. Further, the Facility's SWPPP does not include many elements required by the Storm Water Permit, and thus it is erroneous to certify that the SWPPP complies with the Storm Water Permit.

The Facility Owners and/or Operators have also submitted incomplete Annual Reports. For instance, in the 2010/2011 and 2011/2012 Annual Reports the Facility Owners and/or Operators have failed to include required explanations for its failures to conduct certain required sampling and/or observations. In the 2012/2013 and 2013/2014 Annual Reports, as the reason no samples were collected the Facility Owners and/or Operators state that the Facility "is a construction based business and during inclement weather our facility is closed." Not only does information available to Waterkeeper demonstrate that the Facility does operate during storm events, the Storm Water Permit and the 2015 Storm Water Permit do not excuse failures to collect required samples on this basis.

In addition, the facility operator must report any noncompliance with the Storm Water Permit at the time that the Annual Report is submitted, including 1) a description of the noncompliance and its cause, 2) the period of noncompliance, 3) if the noncompliance has not been corrected, the anticipated time it is expected to continue, and 4) steps taken or planned to reduce and prevent recurrence of the noncompliance. Storm Water Permit, Section C(11)(d). The Owners and/or Operators have not reported non-compliance as required.

Information available to Waterkeeper indicates that the Facility Owners and/or Operators have submitted incomplete and/or incorrect Annual Reports that fail to comply with the Storm Water Permit. As such, the Facility Owners and/or Operators are in daily violation of the Storm Water Permit. Every day the Facility Owners and/or Operators conduct operations at the Facility without reporting as required by the Storm Water Permit is a separate and distinct violation of the Storm Water Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. §1311(a). The Facility Owners and/or Operators have been in daily and continuous violation of the Storm Water Permit's reporting requirements every day since at least February 18, 2011. These violations are ongoing, the 2015 Permit's annual reporting requirements are as stringent as the 1997 Permit requirements, and Waterkeeper will include additional violations when information becomes available, including specifically violations of the 2015 Permit reporting requirements (*see* 2015 Permit, Sections XII. and XVI.). The Facility Owners and/or Operators are subject to civil penalties for all violations of the Clean Water Act occurring since February 18, 2011.

## IV.  RELIEF SOUGHT FOR VIOLATIONS OF THE CLEAN WATER ACT

Pursuant to Section 309(d) of the Clean Water Act, 33 U.S.C. § 1319(d), and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4, each separate violation of the Clean Water Act subjects the violator to a penalty for all violations occurring during the period commencing five years prior to the date of the Notice Letter. These provisions of law authorize civil penalties of up to $37,500.00 per day per violation for all Clean Water Act violations after January 12, 2009.

In addition to civil penalties, Waterkeeper will seek injunctive relief preventing further violations of the Clean Water Act pursuant to Sections 505(a) and (d), 33 U.S.C. § 1365(a) and (d), declaratory relief, and such other relief as permitted by law.

Lastly, pursuant to Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), Waterkeeper will seek to recover its costs, including attorneys' and experts' fees, associated with this enforcement action.

## V.  CONCLUSION

Waterkeeper is willing to discuss effective remedies for the violations described in this Notice Letter.  However, upon expiration of the 60-day notice period, Waterkeeper will file a citizen suit under Section 505(a) of the Clean Water Act and Section 304(b) of the Clean Air Act for Robertson's violations of the Storm Water Permit.

If you wish to pursue settlement discussions please contact Waterkeeper's legal counsel:

> Caroline Koch
> Lawyers for Clean Water, Inc.
> 1004A O'Reilly Avenue
> San Francisco, California 94129

> Inland Empire Waterkeeper
> ATTN: Colin A. Kelly
> 3151 Airway Ave., Suite F-110
> Costa Mesa, CA 92626
> Tel: (714) 850-1965 ext. 307

Sincerely,

Colin Kelly
Staff Attorney
Inland Empire Waterkeeper
Orange County Coastkeeper

## SERVICE LIST

VIA U.S. MAIL

Loretta Lynch, Attorney General
U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Jared Blumenfeld
Regional Administrator
U.S. Environmental Protection Agency
Region IX
75 Hawthorne Street
San Francisco, California 94105

Kurt Berchtold
Executive Officer
Santa Ana Regional Water Quality Control Board
3737 Main Street, Suite 500
Riverside, California 92501

Gina McCarthy
U.S. Environmental Protection Agency
William Jefferson Clinton Building
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

Thomas Howard
Executive Director
State Water Resources Control Board
P.O. Box 100
Sacramento, California 95812

**Exhibit 1**

| Sample collected by Waterkeeper (W) or Discharger (D) | Date of sample collection | Sample Location | Parameter | Result | Units | Benchmark | Magnitude of Benchmark Exceedance | California Toxics Rule Criteria/WQO | Magnitude of CTR/WQO Exceedance |
|---|---|---|---|---|---|---|---|---|---|
| 2010-2011 WET SEASON | | | | | | | | | |
| no samples collected | | | | | | | | | |
| 2011-2012 WET SEASON | | | | | | | | | |
| no samples collected | | | | | | | | | |
| 2012-2013 WET SEASON | | | | | | | | | |
| no samples collected | | | | | | | | | |
| 2013-2014 WET SEASON | | | | | | | | | |
| no samples collected | | | | | | | | | |
| 2014-2015 WET SEASON | | | | | | | | | |
| W | 12/12/14 | Outfall 1 | Aluminum | 2800 | ug/L | 750 | 3.733333333 | none | 0 |
| W | 12/12/14 | Outfall 1 | Arsenic | 1.7 | ug/L | 150 | 0 | 340 | 0 |
| W | 12/12/14 | Outfall 1 | Chromium | 8.8 | ug/L | 110 | 0 | none | 0 |
| W | 12/12/14 | Outfall 1 | Copper | 6.9 | ug/L | 33.2 | 0 | 33 | 0 |
| W | 12/12/14 | Outfall 1 | Iron | 3700 | ug/L | 100 | 37 | none | 0 |
| W | 12/12/14 | Outfall 1 | Lead | 2.2 | ug/L | 262 | 0 | 260 | 0 |
| W | 12/12/14 | Outfall 1 | Zinc | 30 | ug/L | 260 | 0 | 260 | 0 |
| W | 12/12/14 | Outfall 1 | Total Suspended Solids | 79 | mg/L | 100 | 0 | none | 0 |
| W | 12/12/14 | Outfall 1 | Oil & Grease | ND | mg/L | 15 | 0 | none | 0 |
| W | 12/12/14 | Outfall 1 | pH | 10.4 | s.u. | 6.0-9.0 | 1.4 above range | 6.5-8.5 | 1.9 above range |
| 2015-2016 WET SEASON | | | | | | | | | |
| D | 9/15/15 | Outfall 1 | Iron | 4.59 | mg/L | 1 | 4.59 | none | 0 |
| D | 9/15/15 | Outfall 1 | Total Suspended Solids | 102 | mg/L | 100 | 1.02 | none | 0 |
| D | 9/15/15 | Outfall 1 | Oil & Grease | 0 | mg/L | 15 | 0 | none | 0 |
| W | 1/5/16 | Outfall 1 | Zinc | 68 | ug/L | 260 | 0 | 260 | 0 |
| W | 1/5/16 | Outfall 1 | N+N | 0.62 | mg/L | 0.68 | 0 | none | 0 |
| W | 1/5/16 | Outfall 1 | Iron | 5.4 | mg/L | 1 | 5.4 | none | 0 |
| W | 1/5/16 | Outfall 1 | Aluminum | 4.2 | mg/L | 0.75 | 5.6 | none | 0 |
| W | 1/5/16 | Outfall 1 | pH | 9.75 | s.u. | 6.0-9.0 | .75 above range | 6.5-8.5 | 1.3 above range |
| W | 1/5/16 | Outfall 1 | Specific Conductance | 180 | umhos/cm | 200 | 0 | none | 0 |
| W | 1/5/16 | Outfall 1 | Total Suspended Solids | 220 | mg/L | 100 | 2.2 | none | 0 |
| W | 1/5/16 | Outfall 1 | Oil & Grease | 2.5 | mg/L | 15 | 0 | none | 0 |
| W | 1/5/16 | Outfall 1 | Copper | 9.6 | ug/L | 33.2 | 0 | 33 | 0 |
| W | 1/5/16 | Outfall 1 | Lead | 8.9 | ug/L | 262 | 0 | 260 | 0 |
| W | 1/5/16 | Outfall 1 | Chromium | 11 | umhos/cm | 110 | 0 | n/a | 0 |
| W | 1/5/16 | Outfall 1 | Arsenic | 2.5 | ug/L | 150 | 0 | 340 | 0 |
| W | 1/5/16 | Outfall 1 | Total Organic Carbon | 10 | mg/L | 110 | 0 | none | 0 |
| D | 1/5/16 | Outfall 1 | Iron | 1.14 | mg/L | 1 | 1.14 | none | 0 |
| D | 1/5/16 | Outfall 1 | Total Suspended Solids | 264 | mg/L | 100 | 2.64 | none | 0 |
| D | 1/5/16 | Outfall 1 | Oil & Grease | 1.08 | mg/L | 15 | 0 | none | 0 |
| | | | | | | Total Benchmark Exceedances | 11 | Total CTR/WQO Exceedances | 2 |

**Exhibit 2**

| Colton Fire Department Rain Gauge (Lat. 34.07, Long. -117.32) | | |
|---|---|---|
| Date | Day of Week | Daily Precip (Inches) |
| 1/30/11 | Sunday | 0.67 |
| 2/16/11 | Wednesday | 0.17 |
| 2/18/11 | Friday | 0.39 |
| 2/19/11 | Saturday | 0.71 |
| 2/25/11 | Friday | 0.41 |
| 2/26/11 | Saturday | 0.94 |
| 3/20/11 | Sunday | 0.78 |
| 3/21/11 | Monday | 0.25 |
| 3/23/11 | Wednesday | 0.37 |
| 3/25/11 | Friday | 0.2 |
| 5/17/11 | Tuesday | 0.1 |
| 5/18/11 | Wednesday | 0.42 |
| 7/31/11 | Sunday | 0.15 |
| 10/5/11 | Wednesday | 0.7 |
| 11/4/11 | Friday | 0.42 |
| 11/6/11 | Sunday | 0.24 |
| 11/12/11 | Saturday | 0.19 |
| 11/20/11 | Sunday | 0.62 |
| 12/12/11 | Monday | 0.45 |
| 1/21/12 | Saturday | 0.46 |
| 1/23/12 | Monday | 0.28 |
| 2/15/12 | Wednesday | 0.24 |
| 2/27/12 | Monday | 0.22 |
| 3/17/12 | Saturday | 0.85 |
| 3/18/12 | Sunday | 0.3 |
| 3/25/12 | Sunday | 0.27 |
| 3/26/12 | Monday | 0.16 |
| 4/11/12 | Wednesday | 0.3 |
| 4/13/12 | Friday | 0.55 |
| 4/26/12 | Thursday | 0.6 |
| 10/11/12 | Thursday | 0.57 |
| 11/8/12 | Thursday | 0.37 |
| 11/29/12 | Thursday | 0.15 |
| 11/30/12 | Friday | 0.25 |
| 12/2/12 | Sunday | 0.11 |
| 12/3/12 | Monday | 0.13 |
| 12/12/12 | Wednesday | 0.19 |

| Date | Day of Week | Daily Precip (Inches) |
|---|---|---|
| 12/13/12 | Thursday | 1.27 |
| 12/15/12 | Saturday | 0.11 |
| 12/18/12 | Tuesday | 0.16 |
| 12/24/12 | Monday | 0.31 |
| 12/26/12 | Wednesday | 0.22 |
| 12/29/12 | Saturday | 0.25 |
| 1/24/13 | Thursday | 0.26 |
| 1/25/13 | Friday | 0.57 |
| 1/27/13 | Sunday | 0.13 |
| 2/8/13 | Friday | 0.57 |
| 2/19/13 | Tuesday | 0.38 |
| 2/20/13 | Wednesday | 0.1 |
| 3/7/13 | Thursday | 0.2 |
| 3/8/13 | Friday | 0.58 |
| 5/6/13 | Monday | 0.1 |
| 7/20/13 | Saturday | 0.18 |
| 8/19/13 | Monday | 0.1 |
| 10/9/13 | Wednesday | 0.44 |
| 11/21/13 | Thursday | 1.48 |
| 12/7/13 | Saturday | 0.34 |
| 2/6/14 | Thursday | 0.12 |
| 2/27/14 | Thursday | 0.24 |
| 2/28/14 | Friday | 1.63 |
| 3/1/14 | Saturday | 0.49 |
| 4/2/14 | Wednesday | 0.44 |
| 4/25/14 | Friday | 0.39 |
| 4/26/14 | Saturday | 0.37 |
| 8/2/14 | Saturday | 0.18 |
| 8/3/14 | Sunday | 0.47 |
| 8/20/14 | Wednesday | 0.35 |
| 9/7/14 | Sunday | 0.35 |
| 11/1/14 | Saturday | 0.56 |
| 11/21/14 | Friday | 0.13 |
| 12/2/14 | Tuesday | 1.18 |
| 12/3/14 | Wednesday | 0.63 |
| 12/4/14 | Thursday | 0.17 |
| 12/12/14 | Friday | 1.67 |
| 12/17/14 | Wednesday | 0.36 |
| 12/30/14 | Tuesday | 0.23 |

| Date | Day of Week | Daily Precip (Inches) |
|---|---|---|
| 1/11/15 | Sunday | 0.29 |
| 1/26/15 | Monday | 0.24 |
| 2/22/15 | Sunday | 0.54 |
| 2/23/15 | Monday | 0.56 |
| 3/1/15 | Sunday | 0.14 |
| 3/18/15 | Wednesday | 0.4 |
| 4/25/15 | Saturday | 0.12 |
| 5/8/15 | Friday | 0.31 |
| 5/14/15 | Thursday | 0.37 |
| 7/18/15 | Saturday | 0.55 |
| 7/19/15 | Sunday | 0.43 |
| 7/30/15 | Thursday | 0.15 |
| 8/6/15 | Thursday | 0.01 |
| 9/15/15 | Tuesday | 1.89 |
| 10/4/15 | Sunday | 0.14 |
| 10/5/15 | Monday | 0.06 |
| 10/7/15 | Wednesday | 0.01 |
| 10/15/15 | Thursday | 0.1 |
| 11/2/15 | Monday | 0.02 |
| 11/3/15 | Tuesday | 0.05 |
| **Riverside Municipal Airport Rain Gauge (Lat. 33.951946, Long. -117.444168)** | | |
| Date | Day of Week | Daily Precip (Inches) |
| 11/4/15 | Wednesday | 0.15 |
| 12/14/15 | Monday | 0.1 |
| 12/20/15 | Sunday | 0.16 |
| 12/22/15 | Tuesday | 0.35 |
| 1/5/16 | Tuesday | 0.7 |
| 1/6/16 | Wednesday | 0.79 |
| 1/7/16 | Thursday | 0.96 |
| | **Total Rain Days** | **103** |